STATE, Respondent, v. BESS, Appellant.

(No. 4,717.)

(Submitted June 2, 1921. Decided July 2, 1921.)

[199 Pac. 426.]

*Criminal Law—Murder—Change of Venue—Local Prejudice—Newspaper Accounts—Evidence—Experts—Reading Extracts from Text-books — Instructions — Alibi — Jury — Separation During Trial—Striking Affidavits.*

Murder—Change of Venue—Local Prejudice—Proper Denial.

1. Evidence produced by defendant in support of his motion for change of venue on account of local prejudice, consisting of six affidavits and the oral statements of three witnesses, to the effect that because of prejudice against defendant, under charge of murder, he could not secure a jury in the county which would give him a fair and impartial trial, *held* insufficient to show that the trial court abused its discretion, where the state produced affidavits of more than a hundred persons from all parts of the county, deposing that in their respective neighborhoods there existed no prejudice against him, and where the *voir dire* examination of the jury disclosed that of the forty talesmen called, only fourteen were excused because they had formed an opinion upon the merits of the case.

Same—Change of Venue—Newspaper Accounts—When Insufficient to Show Prejudice.

2. Before the effect of newspaper articles giving an account of a murder can be pronounced so highly prejudicial as to warrant a change of venue, it must be shown that they were passionate enough to excite undue prejudice, to the extent of rendering it impossible for accused to secure a jury free from exception.

Same—Evidence—Reading Extracts from Text-books—When Permissible.

3. Where defendant's counsel, on cross-examination of a physician, had read from a medical text-book, and, for the purpose of discrediting witness, asked him if he agreed with a certain portion of the statement of the author upon the effect produced by hard-nosed bullets, and if a soft-nosed bullet would not mushroom as soon as it struck tissue, the state was properly permitted on redirect, for the opposite purpose, to read the entire statement upon the subject and ask the witness if he agreed with it.

Same—Firearms—Experts—Admissibility of Evidence.

4. A hunter and an ex-soldier who had qualified as experts in the use of a rifle were properly permitted to testify as to the effect of hard and soft nosed bullets to rebut testimony in support of de-

1. Change of venue on account of impossibility of impartial trial in the county, see note in 74 Am. Dec. 244.

2. Weight of newspaper articles as evidence of prejudice against accused entitling him to change of venue, see note in 18 Ann. Cas. 789.

3. Examination of expert witnesses in connection with use of scientific books, see note in 16 Ann. Cas. 818.

fendant's theory that the death of deceased was caused by a hard-nosed bullet.

Same—Experts—Specific Instances—Harmless Error.

5. Though the practice of calling for specific instances to qualify a witness to give expert evidence should not be sanctioned, the admission of testimony of an ex-soldier as to particular instances of the effect of hard-nosed and soft-nosed bullets on soldiers of the United States in France was not reversible error where his answers were more favorable to defendant than to the state, and therefore harmless.

Same—Experts—Foundation for Opinions—Evidence.

6. One offering an expert as a witness, for the purpose of showing the strength of the opinion he is about to give, may have him specify in detail the observations on which the opinion is based, and the opposite party on cross-examination may call for the particular observations of the witness, and probe the underlying facts to the fullest extent for the purpose of affecting the strength of the opinion expressed.

Same—Alibi—Instructions—Refusal, When not Error.

7. Instructions that the burden was on the state to prove that defendant was present at and participated in the homicide, and that, if it failed to prove such facts beyond a reasonable doubt, the jury must acquit him, were properly refused, defendant having tendered no instruction defining the term "alibi" in such words that the jury could not have misunderstood the issue presented.

Same—Alibi—Refusal of Instruction—When Harmless.

8. Where from the entire charge the jury must have fully understood that if they entertained a reasonable doubt whether defendant was so far away from the scene of the shooting that he could not have done it, he must be acquitted, refusal of offered instructions to the effect that the burden of proving his presence or participation in the crime was upon the state, and that, failing to sustain such burden, acquittal should follow, was not reversible error.

Same—Instructions—Justification—Mitigation—Burden of Proof.

9. In a prosecution for murder, where the fact that defendant killed deceased was established, and there were no circumstances tending to justify or excuse the act, it was not error to instruct, in the language of section 9282, Revised Codes, that, the commission of the homicide being proved, the burden of proving circumstances of mitigation, justification, or excuse devolved on defendant, unless the state's proof showed the crime amounted only to manslaughter, or that defendant was justifiable or excusable.

Same—Trial—Jury—Separation—Striking Affidavits—When not Reversible Error.

10. Where all the jurors and bailiffs testified that the jury was kept together, heard no other evidence than that adduced on the trial, communicated with no one, and that no facts other than those in evidence were considered by them, it was not reversible error to strike out affidavits to the effect that they were not kept together during the trial and their deliberations, since the result would have been the same had the court considered the question on the merits.

*Appeals from District Court, Stillwater County; Albert P. Stark, Judge.*

ELIJAH BESS was convicted of murder in the first degree, and appeals from the judgment and order denying a new trial. Affirmed.

*Mr. E. E. Enterline, Mr. C. C. Cisel* and *Mr. Geo. A. West-over,* for Appellant, submitted a brief; *Mr. Enterline* argued the cause orally.

The petition of the defendant for a change of venue should have been granted and the cause transferred to some county where prejudice did not exist and where a fair and impartial trial could have been had. (Rev. Codes, sec. 9219; *State* v. *Spotted Hawk,* 22 Mont. 33, 55 Pac. 1026; *People* v. *Suesser,* 132 Cal. 631, 64 Pac. 1095.) The court erred in permitting Doctor Smith to read into the record medical authorities and express his opinion upon those authorities concerning the nature and character of gunshot wounds when inflicted with hard-nosed and soft-nosed bullets and in which he was permitted to express an opinion upon a hypothesis not predicated upon the evidence. (*Schumacher* v. *Mary Hospital et al.,* 58 Mont. 447, 193 Pac. 397.)

The hypothesis in the question propounded to Dr. Smith and here under discussion instead of being predicated upon facts introduced in evidence was admitted in the face of the fact that Dr. Smith had testified that a wound caused by a mushroomed bullet would always leave a tear at the point of exit and that the wound of the deceased at the point of exit was a clean-cut incised wound as hereinbefore mentioned. The principle is elementary that in asking a hypothetical question of an expert witness the facts proven must be taken as a basis for the hypothesis. (Rogers on Expert Testimony, 2d ed., sec. 27; *Carman* v. *Montana Cent. Ry. Co.,* 32 Mont. 137, 79 Pac. 690.)

The testimony given by the witnesses Brownfield and Carleton in rebuttal on behalf of the state was no doubt introduced to meet the testimony given by Mr. Frederick Collins, who

testified as an expert on gunshot wounds on behalf of the defendant. Collins was the only expert who had a thorough knowledge of the subject upon which testimony was admitted and the only expert who was properly examined and who gave competent testimony. Instead of counsel for the state examining Brownfield and qualifying him as an expert by his experience and observation, counsel for the state, as shown by the specification of errors, was permitted to interrogate the witness concerning particular cases. This was error. "While the opinion of experts may be based on their observation and experience in similar cases, yet the principle is well settled that such witnesses cannot on their direct examination be questioned concerning particular cases which have happened to come within their observation, and which have no connection with the case in hand." (Rogers on Expert Testimony, 2d ed., sec. 25.)

Instruction No. 15, given by the court over the objection of the defendant, was no doubt predicated upon the provisions of section 9282, Rev. Codes 1907. An instruction would of course be proper in a case where the evidence disclosed circumstances coming under the provisions of that section, although we are at a loss to comprehend what the clause "that the defendant was justifiable or excusable" means. Specific objections were made to the giving of this instruction by counsel for the defendant upon the grounds that all that was required of the defendant in the case in the event that the state made out a *prima facie* case against him was to introduce sufficient evidence to create in the minds of the jury a reasonable doubt as to his guilt, and further, that there was no evidence introduced upon which to predicate the instruction. This court has had occasion to refer to and construe the provisions of section 9282, *supra*, in cases of homicide, but an examination of the cases will disclose that in all of them the killing was admitted and a plea of justification or excuse was interposed. (*State* v. *Byrd*, 41 Mont. 585, 111 Pac. 407; *State*

v. *Crean,* 43 Mont. 47, Ann. Cas. 1912C, 424, 114 Pac. 603;
*State* v. *Leakey,* 44 Mont. 354, 120 Pac. 234; *State* v. *Halk,*
49 Mont. 173, 141 Pac. 149; *State* v. *Kuum,* 55 Mont. 436,
178 Pac. 288.) It is our contention that the provisions of that
section have no application at all where a defense of alibi is
interposed. There would be nothing in the evidence in a case
of alibi justifying or excusing the homicide. We find that this
court in the case of *State* v. *Felker,* 27 Mont. 451, 71 Pac.
668, used the following language: ''In this state it is now
the established rule that even where the so-called affirmative
defenses are interposed—such as alibi, insanity and justifiable
homicide—no greater burden rests upon the defendant than
to introduce sufficient evidence to raise a reasonable doubt.
This rule has been applied in the construction of sec. 2081 of
the Penal Code (sec. 9282, *supra*).''

The affidavits attached to the defendant's motion for new
trial clearly show that the jury was permitted to commingle
indiscriminately with citizens and witnesses who were preju-
diced against the defendant. The bailiffs were not sworn and
were changed by the sheriff without permission or order
of the court. One of the state's witnesses acted as bailiff, and
according to his testimony he was placed in charge of the
jury by the sheriff after the court adjourned and remained
with the jury for one night. (Rev. Codes, sec. 9300; *People*
v. *Maughs,* 149 Cal. 253, 86 Pac. 187; *People* v. *Cord,* 157 Cal.
562, 108 Pac. 511; *Nicholson* v. *State,* 18 Wyo. 298, 106 Pac.
929.)

*Mr. Wellington D. Rankin,* Attorney General, *Mr. L. A.
Foot,* Assistant Attorney General, for Respondent, submitted a
brief, Mr. *Foot* argued the cause orally.

The trial judge is generally familiar with the local situation,
and can properly estimate the weight to be given to the affi-
davits and evidence, submitted on a motion for change of
venue, and a judicial discretion exercised, under such circum-
stances, should not be interfered with, unless its abuse is

so clearly manifest as to call for a reversal. (*State* v. *Welty,*
65 Wash. 244, 118 Pac. 9; *State* v. *Caseday,* 58 Or. 429,
115 Pac. 287; *Johnson* v. *State,* 1 Okl. Cr. 321, 18 Ann.
Cas. 300, 97 Pac. 1059.)    The publishing of accounts
in newspapers pretending to give the facts of the crime,
if not inflammatory in their nature, are not sufficient
to justify granting a change of venue.    (*State* v. *Brown,*
130 Iowa, 57, 106 N. W. 379.)   "An affidavit against a whole
community that states the mere conclusions of the witness
is of no consequence whatever.   It ought to state the facts so
that the court, and not the witness, may determine whether
the community is prejudiced.   The court is to make a finding
from the facts.   It is to determine in a judicial manner whether
an impartial trial may be had."   (*State* v. *Spotted Hawk,* 22
Mont. 33, 55 Pac. 1026; *Kennon* v. *Gilmer,* 9 Mont. 108, 22
Pac. 448; *Territory* v. *Manton,* 8 Mont. 95, 19 Pac. 389; see,
also, *State* v. *Russell,* 13 Mont. 184, 32 Pac. 854; *Territory* v.
*Corbett,* 3 Mont. 50.)

Appellant complains that the expert witness, Doctor Smith,
was permitted to read from medical books and express his opin-
ion as to the correctness of the text of such books.   In the
face of the decision of this court in the case of *Schumacher* v.
*Murray Hospital et al.,* 58 Mont. 447, 193 Pac. 397, we must
admit that such method was improper, and if on the testimony
of these two witnesses depended the case, it would probably
be sufficient grounds for reversal.   However, other witnesses
who testified from actual experience and without any medical
books corroborated the witnesses complained of.   There was
sufficient expert testimony, untainted by error, to enable the
jury to find that the bullet which killed the deceased was
soft-nosed, and the error becomes of little consequence and
nonprejudicial to the appellant.   (See 17 C. J., sec. 3663 (b),
at p. 321.)

The witnesses Brownfield and Carleton exhibited a degree
of knowledge on the subject of soft and hardnosed bullets,
gained from experience and observation, and their opinion was

valuable and entitled to be received, in the exercise of sound discretion of the trial court, and submitted to the jury for what it was worth. (5 Ency. of Evidence, 530–533; *People* v. *Gibson,* 106 Cal. 458, 39 Pac. 864.)

Instruction No. 15, assigned as error by appellant, is in the exact words of the statute, section 9232, Revised Codes of 1907, and is not inherently erroneous. (*State* v. *Powell,* 54 Mont. 217, 169 Pac. 46; *State* v. *Halk,* 49 Mont. 173, 141 Pac. 149.) If it has no application to this case, it certainly does not affect any rights of the appellant, and their error, if it be one, is harmless.

The affidavits of the bailiffs and the jurors, filed in opposition to the charges by appellant that the jury had not been properly kept together and had been influenced by discussions with other persons during the progress of the trial, denied appellant's charges. If the bailiffs failed to perform their duty, or the jurors disregarded the admonition of the court not to discuss the case or allow it to be discussed in their presence by others, then they, or such of them as might have been guilty, would have been in contempt of court. However, the trial court was evidently satisfied that its orders and instructions had been complied with, as he made no order citing anybody for contempt. In the case of *People* v. *Maughs,* 149 Cal. 253, 86 Pac. 187, cited by appellant, the court, after placing the jury in the custody of the sheriff, made another order permitting part of them to go home. The case is hardly in point, nor is the case of *Nicholson* v. *State,* 18 Wyo. 298, 106 Pac. 929.

*Mr. M. L. Parcells,* County Attorney of Stillwater County, for Respondent, submitted a supplemental brief, and argued the cause orally.

MR. JUSTICE COOPER delivered the opinion of the court.

Appeals from the judgment and order denying a new trial. The defendant was tried in the district court of Stillwater

county and convicted of murder in the first degree, the jury fixing his punishment at imprisonment in the state penitentiary for life.

From defendant's brief, we take the following statement of the facts: "On the morning of July 5, Lyons and his hired man went to work on a fence belonging to Lyons, which ran north and south, and then east and west, on the lands belonging to Lyons, and situate north of the defendant's place of residence. Lyons was engaged in removing wire from posts on a fence on the north boundary line of defendant's lands, which wire, when removed, was taken to the hired man, who placed it on the new fence in the course of construction by Lyons. Lyons was working on an elevation west of the hired man, and less than a quarter of a mile distant from him, but could not be seen by the hired man on account of the elevation. Lyons was seen about 2 o'clock in the afternoon by the hired man when he came down from the hill for the purpose of getting a drink of water from the Stillwater River, which runs in an easterly direction by the premises of the defendant and the deceased. After getting a drink Lyons again went west on the elevation where he had been engaged in working before, and was not seen again by the hired man until the latter found his body about 6 o'clock in the evening of that day. The body was found apparently 1,365 feet northwest of defendant's dwelling-house. The difference in the elevation between defendant's dwelling-house and the place where Lyons' body was found was 364 feet; that is to say, the point where Lyons' body was found was 364 feet higher than the dwelling of the defendant. The physician who performed the autopsy testified that an examination of the body disclosed that the bullet passed through the lower portion of the abdominal cavity, a portion of the rectum, the lower part of the sigmoid, the iliac vein, and deflected from the rim of the pelvis and passed out, causing death. On the morning of July 5, 1919, the defendant left his home, and did not return until evening. On his return

about 5 o'clock in the evening he sat down on the doorstep of his home reading the newspapers, and then he and his wife went in the direction of and by his barn, which was situate northwest of his house. In going in that direction, defendant carried his rifle, and he and his wife were gone about 15 minutes. On his return he took some provisions and his rifle and cartridges, and went south into the mountains. He was not seen again until the evening of July 8, 1919, when he came to a neighbor's ranch several miles distant from his home. Upon learning of the death of Lyons, and that he was accused of the killing, he went to another neighbor in the vicinity, who had him taken to Billings, where he surrendered himself.'' The evidence of the surveyor who furnished the data showing the distance of the body from the different objects was that the body could be seen from the west end of the barn, which the defendant passed in leaving the house, and returning thereto immediately before starting for the mountains. It could not be seen at any point nearer the house than the west end of the barn, a distance of 170 feet from the house. The foregoing will suffice to illustrate the points necessary to be considered in determining this appeal.

The defendant assigns twelve errors, which he claims were [1, 2] committed by the court below. The first is based upon its refusal to grant his motion for a change of venue to some county other than Stillwater or Sweetgrass. The petition alleges that because of prejudice existing against him in Stillwater county, and a general belief that he is guilty, defendant will be unable to secure a jury in Stillwater county that will give him a fair and impartial trial; that the feeling against him grew out of trouble between himself and the deceased, and the publication of two newspaper articles, one appearing in the ''Columbus News Democrat,'' a newspaper published at Columbus, and circulated throughout Stillwater county, the other in the ''Billings Gazette,'' a newspaper published in Billings, and circulated throughout Stillwater and adjacent counties. His prayer is that the case be transferred

to some county other than Stillwater county. In support of his motion, he presented to the trial court proof in the form of six affidavits of as many persons, residing in the neighborhood of the tragedy, in each of which it was averred that defendant could not secure a jury in Stillwater county that could give him a fair and impartial trial, for the reason that many people in all parts of Stillwater county—and especially in Columbus, and south of the Yellowstone River—are prejudiced against him. The affidavit of Mr. E. E. Enterline, one of his counsel, was to the effect that he, together with his co-counsel, Mr. Cecil, traveled over portions of Stillwater county, took pains to investigate the feeling generally entertained by citizens of that county, and found the opinions of many citizens thereof to be that defendant had killed Lyons, and that the newspaper articles referred to and the rumors of trouble between the two men were responsible for the sentiment against him. The affidavit further states that an examination of the jury list disclosed that twenty-nine of the forty jurors, examined as to their qualifications to serve as trial jurors, reside on the south side of the Yellowstone River, and in the town of Columbus, and that because of this feeling the defendant could not get a fair and impartial trial in the county of Stillwater. The oral testimony of Mr. Cecil was to the effect that he had visited various parts of Stillwater county; had conversed with some fourteen citizens of the county residing along the Stillwater River, in the vicinity of the scene of the killing; and that all of them, as well as others with whom they had conversed, expressed the same opinion. Oral evidence of some two or three other witnesses was of substantially the same character. The proof, however, shows no attempt, concerted or otherwise, to do the defendant any physical harm.

The foregoing is a summary of all the evidence adduced in support of the motion for a change of venue. To rebut this proof, the state produced affidavits of more than one hundred witnesses, from all parts of Stillwater county who testified that no prejudice existed against the defendant in their respective

neighborhoods; that the case had not been discussed, and that the defendant could obtain a jury in Stillwater county that would give him a fair and impartial trial.

In the evidence thus produced there is little beyond the expression of individual opinion. The witnesses on behalf of the defendant were evidently his friends, living in the immediate vicinity of the homicide, or in the town of Columbus, their evidence at best reflecting the view of a small proportion of the citizenship of Stillwater county. The affidavits presented by the state were made by citizens residing in all parts of Stillwater county, a great majority of whom were entire strangers to both the defendant and the deceased, appeared to know practically nothing about the case, and were therefore free from bias or prejudice and prompted by no motive other than a desire to see that justice was done. Under these circumstances, we are unable to see how the district court could have reached any other conclusion.

The newspaper article published in the "Columbus News Democrat" spoke of the deceased as a highly respected citizen of the community, pointed the finger of suspicion at the defendant, and gave the substance of the evidence given at the coroner's inquest. The article published in the "Billings Gazette" gave an account of the killing, followed by an interview with the defendant in which he gave what purported to be his version of the trouble between himself and the deceased, and the shooting resulting therefrom. That his account was as favorable to his cause as he was able to make it, and calculated to avert suspicion against him, is a matter hardly open to doubt. At any rate, it did no harm to his cause, and aroused no unusual amount of feeling against him. The character of evidence thus produced is not at all convincing. It gives a court very little, if any, foundation upon which to make a finding. We do not understand that the mere prevalence of opinion in a small portion of the political division from which the trial jury is to be selected furnishes more than a circumstance from which it can be inferred that

a community is so prejudiced against an accused as to deprive him of any of his constitutional rights. The publication of an account of a killing, and even intimating that the defendant is the guilty party, is of itself not to be regarded as a sufficient ground for the transfer of the case to another county for trial. Newspapers do, no doubt, affect public opinion in matters upon which they take a decided stand; but before their effect can be pronounced so baneful and highly prejudicial as to warrant a change of venue, it must be shown that they were passionate enough to excite undue prejudice, to the extent of rendering it impossible for an accused to secure a jury free from exception. The ruling of the court was against the defendant upon this issue. The *voir dire* examination of the jury disclosed that, of the forty talesmen called, ten were peremptorily challenged by the defendant, four by the state, and only fourteen were excused because they had formed an opinion upon the merits of the case. This fact alone goes a long way in overcoming the charge that the court abused its discretion by refusing to change the place of trial. Upon the whole, we find no reasonable ground upon which to differ with the district court upon this issue. The law upon this branch of the case was so clearly and precisely expounded by Mr. Commissioner Jackson, speaking for this court in *State* v. *Davis, ante,* p. 426, 199 Pac. 421, that further discussion of it is now unnecessary.

The second error of which defendant complains is that, [3] on redirect examination, the court permitted Doctor Smith to answer the question of counsel for the state as to whether or not he agreed with the statement of the author of a text-book from which counsel for the state was reading. The question arose in this manner: The witness was the physician who performed the autopsy upon the body of the deceased. On direct examination he had merely described the condition of the body, the course of the bullet, the wound, and its appearance. Defendant's counsel on cross-examination, produced a medical text-book, read from it, and asked the witness if he

[60 Mont. 558.]

agreed with the statement of the author upon the effect produced by hard-nosed bullets, and if a soft-nosed bullet would not mushroom as soon as it struck tissue. To this the witness answered that his understanding was that it might mushroom from a bullet shape into a mass, possibly the shape of a nickel, or a quarter, but that he was not familiar enough with the subject to express an opinion. Upon redirect examination, counsel for the state read the rest of the statement upon the subject, and asked the witness if he agreed with the entire statement of the author. Upon this situation counsel insists that the rule announced in *Schumacher* v. *Murray Hospital,* 58 Mont. 457, 193 Pac. 397, was violated. It was there held to be error for counsel, upon examination in chief, and as substantive evidence, to read from text-books. The rule contended for by counsel is undoubtedly the correct one, the effect of reading extracts of books to the jury, upon direct examination, being to prove the substantial facts therein stated. This may not be done. On cross-examination the rule is different. *Medical books may be referred to on cross-examination to discredit the testimony of experts who refer to them as authority for, or in support of, their opinions, and for the purpose of testing their knowledge of the subject upon which they give opinions.* (*Hess* v. *Lowrey,* 122 Ind. 225, 17 Am. St. Rep. 355, 7 L. R. A. 90, 23 N. E. 156.) Counsel, by inviting the doctor's opinion upon the effect of different bullets upon human flesh, and using a text-book for the purpose of discrediting him (as he had a right to do), opened the door for counsel for the state to fortify the doctor's opinion by calling his attention to the whole statement for the opposite purpose. That assignment is therefore entirely without merit.

Error is also predicated upon the ruling of the court in [4] permitting the witness Brownfield, an expert in the use of a rifle, and as a hunter, and Carleton, who had served as a soldier in France, to state in rebuttal the effect produced by hard-nosed bullets, as distinguished from soft-nosed bullets, upon the ground that the proof of their qualifications was in-

sufficient; and particularly in allowing Carleton to describe the appearance of wounds inflicted upon our soldiers in France by different kinds of bullets. The testimony objected to was given to rebut the testimony of Collins that the death of Lyons was produced by the use of a hard-nosed bullet fired from a high-powered rifle. Both witnesses qualified as experts in the use of firearms to the satisfaction of the court. The record does not sustain counsel's contention in that respect. The effect produced by different bullets did not arise in the state's case in chief. It was competent, of course, for the defendant to introduce proof in support of his theory that the death was caused by a hard-nosed bullet, rather than by a soft-nosed bullet, defendant having sworn that he had never used and had never possessed any hard-nosed bullets. It was not out of place for the state to attempt to rebut that evidence by other witnesses possessing like qualifications.

Neither do we think that the reference to particular in-[5] stances of the effect of bullets upon the soldiers of the United States in France was harmful to the defendant on this occasion. The practice of calling for specific instances as a means of qualifying a witness to give expert evidence ought not to be sanctioned. A careful examination of the answers in response to inquiries of counsel upon that subject, however, convinces us that they were more favorable to the defendant than they were to the state, and therefore harmless. It is [6] always competent for a person offering an expert as a witness, for the purpose of showing the strength of the opinion which he is about to give, to have the witness specify in detail the observations upon which the opinion is based, and it is also, of course, competent for the opposite party, on cross-examination, to call for the particular observations of the witness, and to probe the underlying facts to the fullest extent for the purpose of thus affecting, as far as possible, the strength of the opinion expressed. (*People* v. *Faber*, 199 N. Y. 256, 20 Ann. Cas. 879, 92 N. E. 674, 8 R. C. L., sec. 9, p. 577.) In 17 Cyc. 260, it is said that "The judgment of an expert is of value pre-

cisely in accordance with what there is back of it. Every proper test should therefore be applied. Being hypothetical, it stands or falls with the existence of the facts upon which it is predicated." It would be impracticable, if not impossible, for an appellate court to fix a standard by which a trial court must determine the qualifications of a person to give expert opinion upon a given subject. In this instance, the trial court took the view that the two witnesses, by reason of their practical experience in the use of firearms, and their opportunities for observing actual cases in which different kinds of ammunition had been used, were competent to give their opinions in opposition to those expressed by Mr. Collins. For the reasons stated, no substantial error was committed, as set forth in assignments 6 and 7. (See Wigmore on Evidence, secs. 675, 1922.)

The refusal of the court to give the following instructions proposed by the defendant is also said to be error:

"(6) You are instructed that the law does not call upon the defendant in this case to explain his absence or his animosity toward the deceased. The burden is upon the state throughout this case to establish the defendant's guilt beyond a reasonable doubt.

"(7) The jury will bear in mind that the burden of proving that the defendant was present and committed the alleged offense is upon the prosecution, and, if the prosecution has failed to prove the presence and commission of the alleged offense by the defendant beyond a reasonable doubt, then it is your duty to acquit the defendant."

"(14) The court instructs the jury that you have no right to disregard the testimony of the defendant solely on the ground that he is the defendant, and stands charged with the commission of a crime. The law presumes the defendant innocent until he is proven guilty beyond a reasonable doubt, and the law allows him to testify in his own behalf. The jury should fairly and impartially consider his testimony, together with all the other evidence in the case, and if, from all the

[60 Mont. 558.]
evidence, including the testimony of the defendant himself, the jury have any reasonable doubt that the defendant is guilty as charged in the information, then, and in such case, you should give the defendant the benefit of that doubt, and acquit him.''

''(16) You are instructed that if, after considering all the evidence in this case, you should entertain a reasonable doubt as to whether the deceased was shot and killed with a soft-nosed bullet, then it is your sworn duty to give the defendant the benefit of such doubt upon that question, and find him not guilty.''

''(20) The court instructs the jury that the burden of proving that the defendant was present and participated in the alleged homicide is upon the prosecution, and, if the prosecution fails to prove his presence or participation in the alleged homicide beyond a reasonable doubt, then it is your duty to acquit the defendant.''

The reasons given by counsel in their brief were that the foregoing instructions were ''predicated upon the defense of alibi, and that the defendant, having introduced evidence tending to establish an alibi, was entirely denied the right to have the same considered by the jury.''

The propositions contained in the offered instructions are that the burden of proving that ''the defendant was present and participated in the alleged homicide,'' is upon the state, and if it fails ''to prove his presence or participation in the alleged homicide beyond a reasonable doubt, then it is your duty to acquit the defendant.'' In volume 1 of the third edition of Bouvier's Law Dictionary, we find the following: ''Alibi. (Lat. elsewhere) Presence in another place than that described.'' If, as the defendant's counsel now insist, the defendant's absence from the scene of the homicide at the time of the killing was relied upon as one of his chief grounds of defense, he should have tendered an instruction defining the term ''alibi,'' and so wording it that the jury could not have misunderstood the issue presented for their determina-

tion.    The instructions proposed do not present that issue to the jury.

Under our system, it is the duty of counsel to request the court to give such instructions as he desires.    If he fails to follow the statute in that respect, this court will indulge the presumption that the issue was not deemed of sufficient moment to warrant its submission to the jury.    Any other course would encourage counsel to try his case in the district court upon one theory, and another and distinct theory in this court, and thus produce uncertainty and confusion which would seriously hamper the administration of the criminal law.    Had counsel prepared an instruction in writing, defining the term "alibi" for the guidance of the jury in its consideration of the evidence upon that point, as he is required to do by subdivision 4 of section 9271 of the Revised Codes, a different question would arise.

The court, in its instruction No. 7, distinctly told the jury [8] that no person could be convicted of murder unless the death of the person alleged to have been murdered, and the fact of the killing by the defendant, are established as independent acts.    In the same instruction it also used this language: "The fact of the killing must be established by direct proof, beyond a reasonable doubt, and the fact that the killing was done by the defendant must be established beyond a reasonable doubt."

The court also defined the term "reasonable doubt" without exception by defendant, and further charged that the defendant was presumed to be innocent, "and particularly of the crime charged," until the crime was proven, and, in case of a reasonable doubt whether his guilt is satisfactorily shown, he should be acquitted.    From the entire charge, it is clear to us that the jury must have fully understood that, if they entertained a reasonable doubt as to whether the defendant, at the time of the shooting, was so far away from the scene that he could not have committed the act, the state had failed to prove

his guilt, and that the defendant must be acquitted. By defendant's own admission he was within rifle-shot of the deceased at or near the time of the killing. He left the doorstep of his house with his rifle in his hands, almost immediately returned to the house, hastily gathered up some provisions to take along, and passed out of sight toward the mountains. In our opinion, these conceded facts furnish ample ground for the inference that he assumed a position from which he could see the deceased removing a fence in opposition to his will, and in a spirit of anger, revenge and malice shot him, and without delay went into the mountains, where he stayed for the space of three days.

Appellant's contention that the court erred in giving as its [9] instruction No. 15, a literal copy of section 9282 of the Revised Codes, has no merit. It reads: "Upon a trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." As was said by Chief Justice Brantly in the case of *State* v. *Colbert*, 58 Mont. 584, 194 Pac. 145: "In murder cases, when the killing is proved, the burden shifts to the defendant to adduce evidence tending to show mitigation, excuse, or justification. * * * (Rev. Codes, sec. 9282.) When, therefore, the homicide is established, nothing else appearing, the presumption of innocence is overcome"; and the presumption that a person intends the natural consequences of his voluntary act "comes to the aid of the prosecution and establishes the malicious intent which is a necessary element of the crime, and warrants a verdict finding the defendant guilty of murder. To warrant a finding of murder in the first degree, the prosecution must, of course, establish premeditation and deliberation. (*State* v. *Kuum*, 55 Mont. 436, 178 Pac. 288.) But to establish murder

as defined in our Codes (section 8290), proof of the killing alone is sufficient to make out the case.''

Under the circumstances shown in the evidence, there was ample room for the jury to conclude that the defendant killed the deceased. Having established that fact, clearly the burden was then upon the defendant to show circumstances of mitigation. The finding of the jury precludes the suggestion that there were any circumstances tending in any manner to justify or excuse the act. The state was entitled to this instruction and it was not error upon the part of the court to give it.

Error is also claimed because the court struck out and re-[10] fused to consider the affidavits touching the charge that the jury were not kept together during the trial, and their deliberations upon the verdict. To rebut this evidence, each of the twelve jurors, as well as the three bailiffs, under whose charge they were, testified that they were kept together, and not allowed to separate; that they heard no other evidence than that adduced upon the trial; that they did not communicate with any person during the trial, nor misconduct themselves in any manner whatsoever; and that no facts other than those embodied in the evidence upon the trial entered into their consideration of the case. We have carefully considered the evidence upon this question, and are of the opinion that the result would have been the same had the court considered the question on the merits, instead of striking them from the files.

After a painstaking examination of the proceedings in the court below, embracing more than 850 full pages of typewritten matter, and a thorough examination of every legal question argued and suggested in the briefs of counsel, we are satisfied that every debatable ground of error has been urged in defendant's behalf. While we have not discussed all the errors alleged to have been committed, we have carefully considered them all, and are satisfied that every substantial

right of the defendant was respected, and that the verdict and judgment are fully justified by the evidence.

The judgment and order appealed from are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REYNOLDS, HOLLOWAY and GALEN concur in the result.

Rehearing denied July 18, 1921.