PEOPLE, PLAINTIFF AND APPELLEE, *v.* COLLAZO, DEFENDANT
AND APPELLANT.

## APPEAL from the District Court of Aguadilla in a Prosecution for Voluntary Homicide.

### No. 1981.—Decided April 24, 1924.

CHANGE OF VENUE—LOCAL PREJUDICE.—The concession of a change of venue is a matter that rests within the sound discretion of the trial court and the appellant must make a strong showing on appeal to disturb the ruling.

ID.—ID.—AFFIDAVITS—EVIDENCE.—The court or defendant may supplement affidavits by oral proof, giving the other side a chance to cross-examine. Where testimony is given stating principally the conclusions of the witnesses and no tangible facts are presented, and the influence or result of newspaper publication is not shown, the court is justified in refusing to grant a change of venue and it may be supposed that the court had some idea of the value of the affidavits of its own knowledge.

ID.—ID.—ID.—JURY.—It does not suffice that there was once a prejudice, because frequently this will subside before the time of the trial. The shooting took place in December, 1920. The trial was had in December, 1921. While the affidavits were taken in 1921, cross-examination might have revealed that the affiants had made no recent fresh investigation. The ease with which a jury is obtained must be taken into account also.

ID.—The responsibility to the public in regard to a change of venue rests with the judge and, therefore, the consent of the district attorney is of little importance.

VIEW—CONSTITUTIONAL RIGHT.—The only object of the view being to enable the jury to determine whether a witness could have heard the panting of two men in a struggle at a distance of fifteen meters, it follows that the view was not a continuation of the trial and that the defendant was not deprived of any constitutional right of being present at every stage of the trial, especially as the defendant raised no objection.

EVIDENCE—EXPERT TESTIMONY.—A medical expert may testify from the appearance of a wound as to the distance between the muzzle of the revolver and the bullet's first contact with the body.

ID.—HOMICIDE—MOTIVE.—When the *corpus delicti* has been proved and the circumstances indicate that the accused man was the perpetrator of the homicide, facts tending even remotely to show a motive are admissible. Therefore the testimony of the mother of the deceased and sister of the defendant was admissible to show the state of the family relations and the alleged hard feeling that the defendant had towards the deceased.

INSTRUCTIONS TO JURY.—One of the errors assigned was that in speaking of the various degrees of crime of which the defendant could be convicted the court said nothing at the moment of an acquittal. *Held:* That this was not error, because the instructions as a whole made it the duty of the jury to acquit in case of reasonable doubt perfectly clear.

NEW TRIAL.—When after the trial a motion for a new trial is made on the ground
that one of the jurors had previously made statements showing that he had
formed an opinion against the defendant, a strong showing is necessary.

The facts are stated in the opinion.

*Messrs. J. B. Soto* and *J. Valldejuli* for the appellant.

*Mr. José E. Figueras, Fiscal,* for the appellee.

MR. JUSTICE WOLF delivered the opinion of the court.

The appellant was accused of murder in the first degree.
He was convicted of voluntary manslaughter. Similarly to
the case of *People* v. *Vélez,* 32 P.R.R. 355, decided July 28,
1923, the appellant has filed no real statement of the case.
He contents himself with mentioning facts like the informa-
tion, the conviction and the like, but he does not set forth
the theory of the defense, nor does he sum up in this part
of his brief the evidence tending to show the theory or an
equivalent statement. To obtain a notion of this defense
we have had to refer to the instructions of the court, the
transcript of the evidence itself and particularly the testi-
mony of the defendant.

At the hearing in this court the appellant abandoned his
first assignment of error, but relied very strongly on the
second, namely, that the court erred in refusing to grant a
change of venue on the ground of local prejudice. To sup-
port his motion for a change of venue the appellant filed
his own affidavit and twenty-nine others. In so far as the
affidavit of the appellant was not contradicted by a counter
affidavit of the government or was insisted upon in the brief,
the thirty affidavits may be considered together. The other
twenty-nine are in form and contents exactly alike. They
only differ among themselves inasmuch as they proceed from
different towns in the districts of Aguadilla and Arecibo.
The appellant says that these affidavits were made by good
or prominent citizens of the respective municipalities or
cities, and, of course, in the absence of any showing or in-
dication to the contrary, these affidavits are entitled to all

the weight that should be given to any affidavit whatsoever. We shall take one affidavit as typical and transcribe it:

"I, Carlos F. Torregrosa, under oath, state:

"That I am of age, Postmaster and resident of Aguadilla, which forms part of the judicial district of Aguadilla, where I now live and have lived continuously for more than fifteen years.

"2.—That I am personally acquainted with José Collazo, the defendant herein, and I am likewise informed that a charge of murder is being prosecuted against him in the Judicial District of Aguadilla.

"3.—That I know of my own knowledge that said defendant cannot obtain a fair and impartial trial in the district of Aguadilla because of the great prejudice and strong feeling against him in this district, his enemies having insistently circulated the report that he is guilty of the crime charged, thus creating the general impression of his guilt that prevails in this municipal district, and also because, by reason of the investigation made by order of the Department of Justice in the case of the then Secretary of the District Court of Aguadilla and his discharge for irregularities in drawing the jury that was to sit in this and other cases in the month of July, 1921, this process has attained such a resounding notoriety in this district that I truly believe that there is no jury in this municipal district that has not already formed an opinion in advance, and still further, because great numbers of the journal *Pica Pica*, containing an article derogatory to the defendant wherein he is held up as a hardened and common criminal, have been circulated throughout this municipal district."

In regard to the law applicable to a change of venue, we have examined, among others, the following authorities: *People* v. *Suesser*, 132 Cal. 631; *People* v. *Congleton*, 44 Cal. 92; *People* v. *Yoakum*, 53 Cal. 566; *State* v. *Hillman*, 42 Wash. 615; *State* v. *Dwyer*, 91 Pac. 314; *State* v. *Bess*, 199 Pac. 426; *State* v. *Davis*, 199 Pac. 421; *People* v. *Fuski*, 192 Pac. 552; *People* v. *Kromphold*, 157 Pac. 599; 27 Ruling Case Law, 815; 16 Corpus Juris, 206. The deduction from them is that the concession of a change of venue is a matter that rests within the sound discretion of the trial court and the appellant must make a strong showing on ap-

peal to disturb the ruling; that little heed is given to statements or publications in newspapers unless a showing is made of the weight and influence of the newspapers and some idea is given of their contents; that the opinions of persons as to a state of local prejudice will be regarded as a mere conclusion unless followed up by some specification; that if, as a result of the trial, a jury is obtained without difficulty and no showing is made that the defendant exhausted his peremptory challenges, this is a fact to be considered by the appellate court and the change of venue in a criminal prosecution must be deemed a wrong to the public unless the necessities of justice require it. Perhaps the law is pretty well summed up in *State* v. *Davis, supra,* approved in *State* v. *Bess, supra,* as follows:

"(1, 2)—The Constitution guarantees to everyone charged with a crime a fair trial before an impartial jury, and it is settled law in this jurisdiction that an application for change of place of trial is addressed to the sound discretion of the trial court, and, unless an abuse of this power is shown, its ruling will not be disturbed. State v. Spotted Hawk, 22 Mont. 33, 55 Pac. 1026, and cases there cited. No extracts from the newspapers were attached to the affidavits, and the record is silent as to what the stories contained. The bald statement that the tale of the crime was printed in newspapers and generally read by the inhabitants of the country, and that therefore the defendant would be deprived of his constitutional right of fair trial by an impartial jury, is a flat conclusion and was properly disregarded by the trial court. State v. Spotted Hawk, supra; Territory v. Manton, 8 Mont. 95, 19 Pac. 387. No fact in the affidavits or testimony appears to move judicial discretion, save the statements that there had been talk of lynching the defendant, and its effect upon the popular mind.

"It must be borne in mind that, while the defendant had been arrested by an armed posse, and at a time when feeling was intense, the inviolability of his person was observed, and in accordance with the high concept of respect for justice the law was permitted, without let or hindrance, to take its course. Naturally, whenever a brutal crime has been committed, there are many whose unbridled tongues vent emotion, but it does not follow that a community's judgment is warped. The record does not disclose the *voir dire*

examination of the jurors, but it suffices to say that, when a jury is obtained on a homicide case after the examination of but 56 men, and no unusual condition is apparent, the statement as to prejudice and the impossibility of securing a fair and impartial jury falls. The showing is entirely insufficient to permit this court to disturb the ruling of the lower court in denying the motion.

" 'The trial judge is generally familiar with the local situation; he knows the prevailing sentiment of the people, in so far as it finds oft-repeated expression; he knows all the facts and circumstances proper to be considered in determining the matter; he may know the persons who make affidavits 'suggesting undue excitement or prejudice, and can properly estimate the weight to be given such affidavit. A judicial discretion exercised under such circumstances should not be interfered with, unless its abuse is so clearly manifest as to call for a reversal.' State v. Welty, 65 Wash. 244. 118 Pac. 9.''

Furthermore, as the *fiscal* points out and as we said in *Fajardo* v. *Soto Nussa,* 23 P.R.R. 71, the court or defendant may supplement affidavits by oral proof, giving the other side a chance to cross-examine. Where testimony is given stating principally the conclusions of the witnesses and no tangible facts are presented, the court is justified in refusing to grant a change of venue and, on appeal, as pointed out *supra,* it may be supposed that the court had some idea of the value of the affidavits of its own knowledge.

It would also appear from some of the authorities that we have examined that a showing of actual prejudice should be made. It does not suffice that there was once a prejudice, because frequently this will subside before the time of the trial. The shooting took place in December, 1920. The trial was had in December, 1921. While the affidavits were taken in 1921, cross-examination might have revealed that the affiants had made no recent fresh investigation. Moreover, these affidavits were apparently prepared by, and certainly sworn to before, the attorney for defendant.

As a mere matter of law, perhaps an attorney has a right to take affidavits of this kind, but it is a practice that we have deplored. The affidavits, as we have seen, are all of

the same kind and follow one another literally. Affidavits prepared in this manner have a certain lack of spontaneity. What the facts were that enabled the affiants at non-contiguous places like Hatillo, Moca and San Sebastián, for example, to reach exactly the same conclusions, would seemingly offer ground for conjecture.

The principal thing to be considered, it seems to us, is whether the defendant had in fact a fair and impartial trial. We have gone carefully through the record and we find no evidence of anybody having been challenged or excused on account of a prejudice against the defendant nor that the defendant exhausted his peremptory challenges. No showing was made, barring a single affidavit presented with the motion for a new trial that we shall consider hereafter, that the defendant was tried by twelve men any of whom were prejudiced against him. It should be borne in mind, too, that we think the evidence was sufficient to have convicted the defendant of murder in the first degree, and the jury, as we have seen, found him guilty of voluntary manslaughter.

At the hearing in this case something was said that the *fiscal* of the district of Aguadilla consented to a change of venue, but it is evident that the responsibility to the public in regard to this matter rests with the judge and not with the *fiscal*. It is the judge who is responsible to the public for the place at which a crime should be tried. At the hearing, however, the *fiscal* appeared and opposed a change of venue.

The next assignment of error relates to the manner in which the jury was chosen, whether there was a sufficient number of jurymen present or whether the court had a right to excuse certain jurymen, but we have disposed of considerations of this kind in the case of *People* v. *García,* 31 P.R.R. 861, and we find no prejudicial error in the selection of the jury.

Another point strongly insisted upon by the appellant is

that the court erred in permitting the jury to inspect the
scene of the shooting unaccompanied either by the court or
by the defendant. In order to get a fair idea of how this
view assumes importance, it would be convenient succinctly
to review the evidence, a duty not satisfactorily performed
by the appellant. Several witnesses testified that they saw
the defendant and the deceased in a struggle which resulted
in the wounding and subsequent death of the latter. All
these witnesses also say that they saw the weapon in the
hands of the defendant and that he fired shots with it there-
after. There was evidence tending to show that the de-
fendant fell to the ground crying, "Oh my wife and chil-
dren, I have been killed!" Most of the testimony tended to
show that the shots were fired while the two men were in a
standing position, but some of the testimony tended to show
that shots were fired while Gómez was falling or thereafter.
The theory of the defense was that in the encounter with
the deceased the defendant had no pistol, but in the strug-
gle the deceased was shot and that the defendant subse-
quently seized and carried off the pistol belonging to the
deceased. When the defendant arrived at his own home in
company with another witness he produced a pistol out of
a drawer to show that his own pistol had been unused. If
it was a fact, as the general finding of the jury would in-
dicate, that the defendant at a short distance away shot and
wounded the deceased, then of course he must have had
another pistol and the possession of another pistol and the
story that he subsequently told would give this shooting
all the earmarks of deliberation and premeditation. We
realize that as the defendant maintains that he did not
shoot and, as he was only convicted of voluntary manslaugh-
ter, the question of deliberation or premeditation plays no
great part in considering the alleged errors of the court
below, but we mention it for any bearing it might have with
regard to the necessity for inspection and for other aspects
of the case. A particular witness by the name of Morell

testified that he was in his room, about to go to bed, when he heard the hard breathing or panting of two men in a struggle. He moved across his room to the window and saw the two men in the struggle and testified that Collazo had a pistol. His initial distance from the point of the shooting at the time that he said he heard the hard breathing or panting of the two men was about fifteen meters. His testimony was impugned on cross-examination and otherwise. Several expert witnesses of the defendant, doctors who qualified as being experts in acoustics, testified that the hard breathing or panting of two men in a struggle could not be heard at such a distance. An expert for the government—very sensibly, we think—said that the possibility of hearing the panting or hard breathing would depend upon the conditions of the atmosphere, the conditions of the house and the hardness of the breathing or panting. It is evident to our mind that the experts for the defense who testified that hard breathing or panting could not be heard fifteen meters away were, to say the least, extremely inexperienced. It is a matter of ordinary experience that hard breathing or panting can be heard forty-five feet away, depending upon all the surrounding conditions. This does not mean that this particular witness did hear or could have heard the panting or the hard breathing under the conditions, but we know that there was such a physical possibility. The examination on the question of whether this panting or breathing could be heard at a distance of fifteen meters occupied a fair amount of the examination and of the cross-examination of the expert witnesses. The importance of this point, it seems to us, was over-emphasized, because it is very possible that the witness was mistaken when he said he heard the hard breathing or panting before he came to the window, but it was easily possible that he heard the scuffling of the feet of the two men engaged in a struggle, or something else, and heard the hard breathing when he came to the window. Whether or not he was mis-

taken in this statement ought not seriously to have crippled his testimony with the jury. At a certain point in the testimony the *fiscal* suggested that perhaps it would be well for the jury to take a view, and therefore, at the close of the testimony, the court asked the jury whether it would like to take a view of the premises. .The reply came from the jury that if the defendant was disposed to admit that the hard breathing or panting of two men in a struggle could be heard fifteen meters away, then the jury did not care about taking a view, but otherwise they would like to have a view of the premises. The defendant was not disposed to admit that there was such a possibility, and the view was ordered. It seems to us that without any abuse of discretion and with no great bearing on the case the court might have refused to allow the view. The court sent the jury out with several officials of the court and instructed the jury not to discuss anything while away. The defendant made no manner of objection to the failure of the court to accompany the jury and made no request for the defendant to accompany the jury and no objection to the failure of the court to order or permit the defendant to go with the jury.

The authorities that the appellant cites, *People* v. *Bush,* 68 Cal. 623, 10 Pac. 169; *People* v. *Milner,* 122 Cal. 172, 184, to the effect that the defendant or the judge should have accompanied the jury, were cases in which the defendant made some objection or. reservation· in the court below. There was one case, not thoroughly considered, in which it does not appear whether objection was made or not. · *People* v. *Yut Ling,* 74 Cal. 569. On the other hand, the *fiscal* cites us to authority that the failure to reserve such an objection or exception waives the right to have either the court or defendant present. *People* v. *White,* 5 Cal. App. 329, 90 Pac. 471; *People* v. *Bonney,* 19 Cal. 427. See also note to *Scott* v. *State,* 122 A. S. R. 727. We are inclined to agree with the *fiscal,* besides, that as the only object was to determine a single thing, namely, the possibility of the witness

hearing at a distance of fifteen meters, this permitted view was not in any real sense a continuation of the trial and that the defendant, in the absence of objection, was not deprived of any constitutional right of being present at every stage of the trial. We are clear that this right, whatever it may be, can be waived, and the appellant has cited us nothing to the contrary.

The fourth error is as follows:

"Fourth.—The Court erred in deciding that the medical expert Dr. Sein could testify regarding the distance at which the shot might have been fired and the nature of the weapon used, establishing a theory as to the position of the person attacked when he received the wound and the position of the assailant with regard to him."

Dr. Sein testified that he was a physician and surgeon; that he attended the deceased before he died and examined the wounds, and that he performed the autopsy on the body of the deceased. The doctor described the examination and operation he made and the course of the bullet, and said that the wound produced by the bullet was the cause of the death. He then testified that the orifices of the wound were clean and that the powder had produced no burnings. Then the *fiscal* asked the witness if he could determine the distance away the revolver was that caused the death. The defendant objected on the ground that the witness was a doctor and not an eye-witness; that the distance at which the shot was fired was a pure question of fact which should be proved by eye-witnesses and not by experts, doctors, and because the matter was a question for the jury. It should be noted that there was no objection at the time that Dr. Sein was not sufficiently qualified as an expert. The *fiscal* said that a doctor could testify in accordance with the knowledge he had and the court agreed, although the testimony might enter into the field of human affairs.

The theory of the defendant was, as we have indicated, that the deceased started the attack and that after their

preliminary meeting the two men were engaged in a struggle and that in the struggle the defendant seized the hand of the deceased and that, as a consequence, the revolver of the deceased was turned on himself. Also, there was evidence on the part of defendant tending to show that he had no revolver. Therefore, the distance of the muzzle of the revolver from the point of contact of the bullet with the deceased was an important matter, of issue in the case.

The ordinary rule is that if the jury could make a certain inference from the facts, no expert testimony is necessary and should be excluded. The cases that we shall cite hereafter make it evident that the distance away of the revolver, as judged by the appearance of the wound, is not generally a matter within the ordinary cognizance of jurymen. That experts may testify from the appearance of the wounds as to the distance between the muzzle of the revolver and the bullet's first contact with the body, the following authorities will show: *State* v. *Asbell* (Kansas), 46 Pac. 770, where it was held that a qualified witness may testify as to whether a wound was produced by a near shot or one fired from a distance. This case, among others, was cited in approval by the Supreme Court of Pennsylvania, *Commonwealth* v. *Santos,* 119 Atl. 600. There the witness was a little uncertain in his testimony and at one time said that the muzzle must have been sixteen inches away and at another at least two feet away. Despite the uncertainty of the testimony, the court had no doubt of the right of an expert to testify as to distance, of course, from the appearance of the wounds. Other authorities are *State* v. *Johns,* 132 N. W. 835; *Boyd* v. *State,* 82 Tenn. 172, 173; *Phillips* v. *State* (Ala.), 54 Southern, 112; *People* v. *Hawes,* 98 Cal. 648, 33 Pac. 791, where the court pointed out that the subject was a proper one for expert testimony and could not be classed with such matters as were discussed in *People* v. *Smith,* 93 Cal. 445, e.g., the position of two persons; *Bearden* v. *State* (Texas), 73 S.W. 17, where the witness testified as

to the effect of a gunshot at various distances. Wharton's Criminal Evidence, 10th Ed., par. 770.

In this case Dr. Sein then said the distance could not be less than four feet. The *fiscal* then asked, "On what do you base your answer?" Then the witness said, or began to say, "Because a gunshot, especially when it is within four feet and especially for weapons of small calibre"—whereupon the defendant objected to further examination on this line because it was not shown that the witness had knowledge in firearms (*balística*). The court overruled the objection and the witness testified to the effect that shots at short distances made powder marks and spotted the borders of the wound.

The principal insistence in this court is that Dr. Sein did not show himself to be a qualified witness in the handling and effect of firearms. Before such an objection was made the witness had testified, without due objection on the ground of his not being sufficiently expert, and he had said that the wound so produced was by a pistol more than four feet away. This may have been an erroneous conception or a mistake, and one other witness, at least, testified to the contrary. The subsequent testimony of Dr. Sein, made after objection, was clearly within the experience of an ordinary doctor with any extended practice, or perhaps without extended practice, namely, that near shots produce powder marks or burns and that distance shots do not. Before testifying to a definite distance, the doctor should have been made to show his experience with firearms, but he was allowed to testify as to the appearance of the wound and the distance without due objection, and no motion to strike was made. At least one medical expert of the defendant gave similar testimony without being duly qualified. We are satisfied, moreover, that in Porto Rico the training of a doctor includes a knowledge of firearms. In general, when a defendant in a criminal case fails to make an objection in due season, but makes it later, if the evidence admitted had a prejudicial tendency, we might permit the objection to be

retroactive. This is doubtful procedure where the defendant makes no motion to strike, especially as the jury would have heard the testimony. We shall not, however, vary the due order to permit the appellant to make an objection where we are convinced that the witness, if necessary, could have qualified himself had a question been put to him, especially when the ruling of the court below was that the training of a physician in Porto Rico involves a knowledge of firearms and their effects (*balística*) and this ruling was not shown to be mistaken.

Furthermore, the question of whether an expert is sufficiently expert is a matter within the discretion of the court. Most physicians of long standing have sufficient experience in this line. Here is what Wigmore says on the general subject (Vol. 1, Second Edition, para. 561):

"Just how far this extends in each jurisdiction is difficult to say. In some, the ruling is not reviewable at all; in others, it is reviewable on certain conditions; in others, the matter is left 'largely' to the trial Court's discretion. But the language of the principle varies in different opinions; and, in practice, the rulings below are constantly reconsidered above, under the guise of ascertaining whether the 'discretion' has been 'abused.' But the reform of the future will find in this principle the nucleus for a beneficent extension of the doctrine of judicial discretion (*ante,* para. 16). Looking at the complication of facts often entering into a witness' competency and best understood by the trial judge alone,—looking at the comparatively trifling character (in relation to all the issues of a trial) of the topics over which controversy arises,—looking at the ample and sure safeguard of cross-examination to reveal the witness' real qualifications,—looking at the injustice of requiring the busy judges of the Supreme Courts to investigate such trifles,—in view of all these considerations, it cannot be doubted that the rule of the future ought to be: *The experiential qualifications of a particular witness are invariably determined by the trial judge, and will not be reviewed on appeal.*"

The defendant might have cross-examined Dr. Sein and shown that he was mistaken. He might have shown that the clothes of the defendant would have prevented, if not burn-

ings at least powder marks, and other things he might have done to debilitate or render harmless the testimony of Dr. Sein. He did introduce other testimony to contradict the expert.

The fourth assignment that we are considering is complex in form and very unsatisfactory. It sequesters several objections. Assignments should be single and specific, and as the brief principally discussed the sufficiency of Dr. Sein as an expert, the defendant would have no real cause of complaint if we gave this assignment no further attention. The appellant complains also that Dr. Sein, over objection, testified to the relative position of the two men. In this regard the Supreme Court of Pennsylvania resumes the jurisprudence as follows:

"There is a divergence of view among the authorities as to whether or not, in a murder trial, opinion testimony concerning the distance covered by a bullet which killed the deseased, the direction from which it came, and the position of the body of the victim, when struck, may be introduced in evidence. Some courts have ruled such proofs to be inadmissible (citing cases). Other courts permit a physician, who has examined the wound, to give his opinion concerning the direction from which the blow or shot came, but not the probable position of the parties (citing cases). The weight of authority seems to be that the examining physician, who has qualified as an expert, may give his views both as to the direction and distance of the shot, as well as the position of the parties (on direction, see Hopt v. Utah, 120 U. S. 430, 7 Sup. Ct. 614, 30 L. Ed. 708, and New York and Ohio cases next above; as to distance, see State v. Asbell, 57 Kan. 398, 409, 46 Pac. 770; Boyd v. State, 82 Tenn. [14 Lea] 161, 169, 173; Preeper v. The Queen, 15 Can. Sup. Ct. Rep. 401; as to position of the body, see Com. v. Dorr, 216 Mass. 314, 317, 103 N. E. 902; Wharton on Homicide [3d Ed.] sec. 609 and cases there cited; on all three points, see 12 Am. & Eng. Enc. Law [2d Ed.] p. 449); but even those courts which consider proofs of this character admissible recognize that it is the province of the jury to determine what weight shall be given to such opinion evidence (see authorities last cited), which, of course, must be the case." *Commonwealth* v. *Santos, supra,* 275 Penn. St. Rep. 515.

Assuming, however, that the position of the two men was within the province of a jury and without the province of expert testimony, Dr. Sein said nothing that was a controverted issue in this case. He said, in effect, that the two men were both standing when the shots were fired, one of them slightly turned. Nearly all the eye-witnesses, and the defendant himself, agreed that the two men were standing. As we have seen, the theory of the defendant was that the wound was inflicted while the two men were in a struggle and the declaration of Dr. Sein as to the position of the two men did not contradict that theory. In *Territory* v. *Wells* (Oklahoma), 78 Pac. 124, the court said:

"While there are some authorities which hold that under no circumstances will expert evidence be admitted as to the position of the body of the deceased at the time when the wound was inflicted, nor as to the position of the person inflicting it, these being considered subjects upon which the jurors are competent to form independent opinions, and that a medical expert can form no better opinion or conclusion from the facts than can the jurors themselves, there are other cases in which the opinions of experts have been received in respect to such matters. Am. & Eng. Enc. of Law (2d Ed.) vol. 12 p. 449, and cases cited. But, if error, we are unable to see how it could have prejudiced the defendant. He was the only witness to the homicide, admitted the shooting, and his statement of the position and attitude of the deceased at the time he fired the fatal shot in no way conflicts with the opinion of the doctor. There is nothing in his opinion inconsistent with the defendant's evidence or theory of defense. Therefore there was no issue upon which the admitted evidence could have exerted any prejudicial influence with the jury. It was manifestly harmless, and, if error, would afford no ground for reversal. People v. Lemperle (Cal.) 29 Pac. 709; People v. Hill (Cal.) 48 Pac. 711."

The modern tendency is to overlook errors that do not affect the substantial rights of the parties. In *People* v. *Alvarez,* 21 P.R.R. 82, we cited section 362 of the Code of Criminal Procedure and the Act of May 30, 1904, to that effect, as follows:

"Section 362. After hearing the appeal, the Supreme Court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties."

"Section 1. (Act of May 30, 1904.) Whenever it appears from the record in any criminal case upon appeal in the Supreme Court, that any requirement of the law has been disregarded by the trial court, the judgment shall not be reversed, unless the error appearing from the record was calculated to injure the rights of either of the parties, and was duly excepted to in the trial court: Provided, however, That the appellate court may take cognizance of fundamental errors, appearing in the record, although not excepted to, and render such judgment thereon as the facts and the law may require."

We also drew attention to the decisions of Oklahoma and Texas. Montana, with only the equivalent of section 362, decided in *State* v. *Byrd,* 41 Mont. 586, not to reverse for non-prejudicial error and held that under such section it should no longer be the rule that prejudice would be presumed. See also *People* v. *Fearly,* 33 Cal. App. 618, and cases; 17 Corpus Juris, 317 *et seq.*

With respect to the sixth to fourteenth assignments, we agree with the *fiscal* and his quotation from Wharton on Homicide, Third Edition, page 914, that when the *corpus delicti* has been proved and the circumstances indicate that the accused man was the perpetrator of the homicide, facts tending even remotely to show a motive are admissible. Therefore the evidence of Antonia Gómez who testified that she was the mother of the deceased and sister of the defendant, was admissible to show the state of the family relations and the alleged hard feeling that the defendant had towards the deceased.

Some complaint is made of the instructions. One specific error is that the court, in speaking of the various degrees of crime of which the defendant could be convicted, said nothing at the moment of an acquittal. However, the instructions as a whole made the duty of the jury to acquit

in case of reasonable doubt perfectly clear. Similar considerations apply to other comments on the instructions. The instructions were good and impartial and we find no justification for some of the criticisms of the judge that the appellant uttered in discussing the denial of the application for a change of venue.

The appellant also filed a motion for a new trial and the overruling of that motion is assigned as error. There was no appeal from the order overruling the motion, but as it was presented before judgment we shall assume the right to consider it. Most of the matters raised in this motion have been disposed of in considering the other assignments. In a supplement, however, to the motion for a new trial it was alleged that there had been passion, prejudice or partiality at the trial, inasmuch as a certain juryman had made public manifestations that the defendant was not guilty. To this supplemental motion the following affidavit was subjoined:

"I, Agustín E. Font, of age, married, attorney and resident of Ponce, under oath, aver:

"That I have personally known Urbino Vargas for many year; that one day in July, 1921, I was talking with the said Urbino Vargas in the town of San Sebastián about the case of José Collazo Bracero and Antonio Gómez when he told me there was no justification for the death of Gómez and that, in his opinion, Collazo had acted imprudently. (sd.) Agustín E. Font."

While the appellant assigned as error the overruling of the motion for a new trial, in the argument of this assignment no reference is made to the affidavit of Font. Mention is made of it exclusively in discussing the failure of the court to grant a change of venue. In the motion for a new trial the failure of the court to order a change of venue is not assigned as error. Also while the court disposed of the motion for a new trial in a reasoned opinion, no mention was made of this affidavit and it probably was not

passed upon in the court below and was abandoned on appeal except in arguing the said motion for a change of venue. Nevertheless, the *fiscal* discussed the affidavit and we shall give it some consideration.

No attempt was made to transcribe the examination of the juror Urbino Vargas at the trial. It must be presumed that on his examination under oath he said that he did not have a formed opinion, or something equivalent. Under section 227, par. 7, of the Code of Criminal Procedure the opinion formed from newspapers, rumors and the like will not disqualify a juror and there is nothing in the affidavit of Font showing how the opinion of Vargas was formed. The presumption, then, would remain that he was not disqualified.

In *Territory* v. *Emilio,* 89 Pac. 242, New Mexico, a carefully considered opinion cited by the *fiscal,* the court in a similar case said that so far as the motion related to the disqualification of a juror it was addressed to the sound legal discretion of the trial court. We are convinced also that the overruling of the motion was a matter within the sound discretion of the trial court and no abuse was shown. In general, where the forming of an opinion was alleged as a disqualification the objection was made at the time the juror was presented and so raised on appeal. *People* v. *Wills,* 100 Cal. 459, and its citations. After the trial the showing made would have to be a strong one.

The remaining errors are matters relating to the discretion of the court in allowing supposed leading questions and other matters of the admission or rejection of evidence which we do not find to be erroneous or, if erroneous, they were clearly not prejudicial, so that we shall not discuss them.

The evidence that we have reviewed succinctly showed that there was ample proof to justify the jury in returning a verdict of voluntary manslaughter, and we rather think it

was the skill of the counsel for the defendant that saved the latter from a conviction on the more serious charge.

The judgment appealed from should be

*Affirmed.*

Chief Justice Del Toro, and Justices Aldrey and Franco Soto concurred.

Mr. Justice Hutchison dissented.