STATE, RESPONDENT, *v.* HOFFMAN, APPELLANT.

(No. 7,122.)

(Submitted May 24, 1933. Decided June 30, 1933.)

[23 Pac. (2d) 972.]

*Mr. S. J. Rigney,* for Appellant, submitted a brief and argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General; *Mr. C. J. Dousman,* Assistant Attorney General, *Mr. Bert I. Packer,* County

Attorney of Teton County, and *Mr. Arthur S. Jardine,* for the State, submitted an original and a supplemental brief; *Mr. J. J. Lynch,* First Assistant Attorney General, and *Mr. Jardine* argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

Defendant was charged with the murder of George Burrell in Teton county on September 20, 1932. He was convicted of murder of the first degree and sentenced to be hanged. He has appealed from the judgment and from an order denying him a new trial. His counsel predicates error in overruling his motion for change of place of trial based upon local prejudice. Defendant's motion was supported by the affidavit of his counsel, stating in effect that defendant is without friends or relatives in Teton county; that George Burrell was a cripple, exciting the sympathy and pity of acquaintances; that Burrell was widely known and highly respected; that affiant has interviewed many people in and near Teton county, and

that they reported to him that the people were excited and wrought up concerning the crime and were up in arms against the defendant; that they were demanding the extreme penalty, and that some stated there was not a chance for him to get a fair and impartial trial; that, in order to avoid mob violence, defendant was removed from the Teton county jail to the jail of Cascade county.

Several newspaper articles were attached to the affidavit which gave the revolting details of the murder, and in some of them suggestion was made that the crime demanded the death penalty. In others an account was given of a confession made by the defendant to undersheriff J. L. Billings. In at least one of them reference was made to a finger-print expert obtaining evidence against the defendant.

It would serve no useful purpose to set forth in detail matters referred to in the newspaper publications; suffice it to say that in one of the articles, chiefly relied upon, appeared the following: "It was deliberate murder and while we naturally loath to sit in judgment of our fellow men, yet the sentiment here is one of hope that the maximum penalty prescribed by law will be accorded. It is not a time for technicalities and hair-splitting distinctions, though, of course, the accused should be given a fair trial. Mr. Burrell was so well known, esteemed, and in a sense pitied, that it is but natural that sentiment here should be very strong against the murderer. But it is necessary in the interest of all society that legal procedure hold sway, and there is every evidence that justice will prevail."

In one newspaper article the suggestion was also made that "a hemp-stretching party will be in order."

In opposition to the motion, the state filed thirteen affidavits, some of which were by candidates for public office who had talked with people in all parts of the county, and they all stated that, while there had been some feeling against the defendant shortly after the crime, the feeling had subsided, and that they were unable to find any prejudice or bias on the part of the people which would prevent the securing of a fair and impartial jury.

The record discloses that thirty-four jurors were examined; one was excused for sickness; one because he was not a tax-payer; one because he was a witness; and one for having conscientious scruples against the death penalty. Only four were excluded for having formed an opinion concerning the merits of the case; the others, not serving, were excused on peremptory challenges.

An application for change of place of trial in a criminal ▮▮ case is addressed to the sound discretion of the trial court, and, unless there has been shown a clear abuse of discretion, its ruling will not be disturbed. (*State* v. *Davis,* 60 Mont. 426, 199 Pac. 421.) And the fact that but few talesmen were examined in order to secure a jury goes a long way in overcoming the charge that the court abused its discretion by refusing to change the place of trial. (*State* v. *Bess,* 60 Mont. 558, 199 Pac. 426.) On the record we are not able to say that the court abused its discretion in refusing to change the place of trial. (Compare *People* v. *Yeager,* 194 Cal. 452, 229 Pac. 40; *State* v. *Hoagland,* 39 Idaho, 405, 228 Pac. 314; *State* v. *Whitfield,* 129 Wash. 134, 224 Pac. 559; *Gentry* v. *State,* 11 Okl. Cr. 355, 146 Pac. 719; *Johnson* v. *State,* 35 Okl. Cr. 212, 249 Pac. 971; *People* v. *Mabrier,* 33 Cal. App. 598, 165 Pac. 1044.)

The next contention is that the court erred in admitting ▮ in evidence the confession made by the defendant. In general, the confession was to the effect that defendant, at about 11:35 on the night of September 20, took a piece of two-inch galvanized pipe about two feet long, and an insulated telephone wire from a barber-shop near the place of business of the deceased, went into Burrell's place of business, and, while Burrell was fixing a calendar on the wall, he struck him on the back of the neck with the pipe. He then turned out the lights and dragged Burrell back of a screen which stood at the end of the counter. He then took the money from the cash register, went behind the screen, found Burrell groaning, and tied the wire around his neck. He returned the pipe to the

barber-shop. Later he went to his room, placed the money in a sock, and hid it under the bathtub.

The record, with respect to the manner of obtaining the confession, shows that defendant was held in jail in the town of Choteau from September 21 until nearly noon on September 24, during which time he denied any knowledge of the crime. On the night of September 23, arrangements were made to have the defendant taken to the jail at Great Falls for questioning. While the defendant was held in the jail at Choteau, a sock containing money was found in the hotel in which defendant roomed at Choteau. This was found concealed under the bathtub. Billings, the deputy sheriff, pursuant to the arrangements made to take the defendant from the jail at Choteau to the jail at Great Falls in company with his wife, left Choteau with the defendant, and, when about twenty-two miles from Great Falls, the deputy sheriff told him there were two things he wanted to know, namely, where he got the sock, and where he got the wire. The defendant then asked Billings if the inquest had been held, and Billings told him the deceased had been buried the day before. The defendant then told Billings he would tell him when they were alone. Upon arriving in Great Falls, and after the defendant was placed in jail at that place, he related to Billings in detail his connection with the crime. About two hours later he repeated in detail the same story to Mr. Packer, county attorney of Teton county, in the presence of Billings, Art Jardine, deputy county attorney of Cascade county, and a stenographer.

It was shown that, before the defendant made the statements to Billings, Billings had said to him, "I have saved your neck," and also stated to the defendant, after he promised to tell when alone, that "it would not hurt him any." But, when the statement was repeated by defendant in the presence of Mr. Packer, Art Jardine and the stenographer, the defendant was specifically advised that any statement he made might be used against him in a criminal trial, and he was advised that he did not have to make any statement if he did not want to. There were no threats made, nor was there any promise or

hope of reward held out to him. The statement was reduced to narrative form, and three or four days later Mr. Jardine presented it to the defendant and told him he would like to have him sign it, but that he did not have to if he did not want to. Defendant stated to Mr. Jardine that the statements in his confession were true, but that he did not wish to sign it. Later Dr. McGregor presented the same written confession to him in the presence of two other witnesses. He read it for twenty or thirty minutes and then signed it. The confession itself reads: "I make this statement free and voluntarily without any threats being made against me nor any promises of any kind made to me, and knowing full well that this statement can be used against me. I committed the offense because I was hungry and broke. I had not eaten for two days and I was desperate and hungry. When I tied the wire around Burrell's neck, I hardly knew what I was doing, and I was desperate and crazy."

The confession was admissible under the rules announced by this court in *State* v. *Dixson*, 80 Mont. 181, 260 Pac. 138, and the cases therein cited, and a further discussion of the law applicable is unnecessary here.

Error is assigned in denying the motion for new trial. It is claimed that the juror Marcus Johnson was not qualified to sit as a juror, for the reason that his name did not appear upon the last tax roll of Teton county. This fact is made to appear by affidavit produced after the trial. The court properly held that this was not a ground for a new trial, in view of the holding in the case of *State* v. *Danner*, 70 Mont. 517, 226 Pac. 475, 476, wherein it was said: "If a defendant does not avail himself of the privilege of examining into the qualifications of prospective jurors before the jury is sworn, he may not assign a juror's incompetency as ground for a new trial, even though his knowledge of the incompetency comes to him for the first time after the trial."

Finally it is contended that a new trial should be had because of the misconduct of juror McLean. On this point the court

is divided as will appear from the subjoined opinions, but the majority hold that the contention is without merit.

MR. CHIEF JUSTICE CALLAWAY: I concur in the foregoing opinion.

The most difficult feature of this case is that which has to do with the alleged misconduct of juror McLean. Upon his *voir dire* examination he testified that he resided eleven miles west of Collins, where he was engaged in farming. He said he had never seen the defendant before the day of trial and was not acquainted with any of the facts in the case; he had never discussed the case with any person or persons claiming to know the facts, and had no personal knowledge of them, nor were the facts discussed in his presence; he knew the deceased by sight only, and did not have any acquaintance with any member of deceased's family; he had not formed or expressed any opinion as to the guilt or innocence of the defendant and did not know of any reason why he could not sit as a trial juror in the case and try it fairly and impartially upon the facts adduced. Counsel for defendant asked this question, "Assuming, Mr. McLean, that the defendant submits testimony to the effect that he was insane by reason of being afflicted with an incurable disease, and that he was unable to distinguish by reason of such insanity between right and wrong, or that he was unable to determine between right and wrong by reason of being a confirmed and chronic alcoholic, drinking of alcoholic liquor for a long period of years to such an extent that it had virtually broken down his mental ability to distinguish between right and wrong, and that he was out of work and hungry at the time he committed the offense, and was prompted by an irresistible impulse to commit the offense, but he did not know what he was doing at that time, or could not know, and the court instructs you as to your duty under that evidence, would you consider such a defense?" to which McLean answered, "I could." He said that he did not have any prejudice against the defense of

insanity, whatever its form, repeated that he did not know of anything which would disqualify him from acting as a fair and impartial juror, and said he was willing to assume the responsibility.

After the trial it was ascertained that, about two months before he became a juror, Mr. McLean, as the Premium Center correspondent of the "Choteau Acantha," had sent in news items to that paper, among which he reported the presence of a group of people from his neighborhood at a dance given in celebration of the recent wedding of Mr. and Mrs. Walker. Complimenting Mr. Walker upon his accomplishments and standing in the community, the writer said: "And when that can be said of a man, it can be said that he has used his talents wisely. * * * Contrasting to this picture of wisely used talents is the picture of the miserable wretch that murdered defenseless and helpless George Burrell. He buried his talents very deep. And when the wheels of justice cease to grind his worthless carcass will lie to rot as deeply buried as was his talent." Further on in his column he said: "Did you notice how quickly our legal officers placed their hands upon the murderer? That is the result of a sixth sense that comes from long experience."

Counsel for defendant insists that the author of the article could not have been a fair and impartial juror, and a new trial should be accorded to the defendant. If a juror has a fixed opinion as to the guilt of the accused which he conceals from the court on his *voir dire,* on the discovery of the fact after conviction a new trial should be granted upon the ground of the juror's misconduct (*State* v. *Mott,* 29 Mont. 292, 74 Pac. 728, 733; *Territory* v. *Kennedy,* 3 Mont. 520), "but no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon public rumor, statements in public journals, or common notoriety, provided it appear to the court, upon his declaration, under oath or otherwise, that he can and will, notwithstanding such opinion, act

impartially and fairly upon the matters to be submitted to him." (Sec. 11962, Rev. Codes, 1921; *State* v. *Juhrey*, 61 Mont. 413, 202 Pac. 762, and cases cited.)

Upon the hearing of the motion, McLean admitted that he wrote the article; he testified that he had been for a number of years an intermittent correspondent of the "Acantha." On the Friday before he wrote the article he was in Collins delivering wheat, and was informed by one Lockhart that George Burrell had been murdered. Lockhart did not know who had killed Burrell, nor did McLean when he wrote the article. He wrote it upon the information furnished by Lockhart. He had not read any account of the death of Burrell before he wrote it. At the dance in Fairfield he heard different ones stating that a man suspected of the murder had been taken to Great Falls, but the name of the suspect was not given. When writing, he had in mind nothing more than illustrating what Mr. Walker had achieved, and what another man had done with his opportunities by committing a murder. He imagined the picture of a man "who would commit a murder of a man like George Burrell, any man that would commit a murder." When he wrote the paragraph calling attention to the speedy apprehension of the "murderer," his chief reference was to the legal talent which apprehended the man, but he did not know the man. All the questions propounded to him upon his *voir dire* examination were read to him, together with his answers, and he swore that each answer given by him was true and correct, "absolutely," he said.

At first blush it would seem that the defendant could not have had a fair trial before the author of the startling article. But, upon an analysis of the surrounding facts, the impression does not persist. Murder is the unlawful killing of a human being with malice aforethought; that which is committed in the perpetration of robbery is of the first degree and warrants the death penalty. If a talesman has conscientious scruples against the infliction of the death penalty, he must not be permitted to serve as a juror. (Sec. 11960, Rev. Codes,

1921.) All persons are presumed to be of sound mind until the contrary appears. The burden of showing the contrary is upon him who asserts it. (Sec. 10728, Id., as amended by Laws of 1925, Chap. 87, p. 115.) Perhaps it may be said that the natural inclination of a law-abiding citizen who is competent to serve as a juror in a case where murder of the first degree is charged (that is, one who has no conscientious scruples against the infliction of the death penalty), upon learning that a citizen has been brutally slain in the perpetration of a robbery, is that the slayer should suffer the extreme penalty.

The surrounding facts considered, McLean in his article merely expressed in florid style his abhorrence of a brutal murder. It was murder of the first degree if done by a sane man. It is most unlikely that the question of the slayer's sanity, when the article was written, two months before the trial, had ever occurred to McLean. It is not reasonable to presume that that contingency was in his mind when in preparing the article he likened the exemplary young man, recently married, to the good servant who improved his talents, pointing to the contrast presented by the "miserable wretch" who had killed Burrell, likening him to the slothful servant who buried his talent. (St. Matthew, xxiv, 14, 30.)

The defendant confessed the killing. In the circumstances, if he were sane, it was murder in the first degree. There could be no defense but insanity. Upon this defense McLean was interrogated upon his *voir dire* and gave answers satisfactory to defendant. No reason appears to doubt that he was a fair and impartial juror upon that issue. (*State* v. *Howard*, 30 Mont. 518, 77 Pac. 50; compare *Keffer* v. *State*, 12 Wyo. 49, 73 Pac. 556; *State* v. *Hoagland*, 39 Idaho, 405, 228 Pac. 314; *State* v. *Gould*, 40 Kan. 258, 19 Pac. 739.) No importance should be attributed to the use of the word "murderer" in the paragraph wherein the officers are complimented for their speedy work. The careless use of the word is well known. In ordinary parlance, when one man is killed by another, the slain

is said to have been "murdered," and the slayer is referred to as his "murderer." (See *State* v. *Morrison,* 67 Kan. 144, 72 Pac. 554.) The reference to the "murderer" was impersonal, indefinite, for McLean did not know who he was. It was only because defendant proved to be the "murderer" that the reference applied to him.

The trial judge who, we must assume, presided with judicial poise, being actuated at all times by a desire to protect the rights of the defendant, heard McLean testify upon his *voir dire* examination touching his competency to serve as a juror, observed his demeanor throughout the trial of the case, heard him testify upon the motion for a new trial, and was doubtless convinced of the sincerity and truth of his statements. Otherwise the court would not have overruled the motion for a new trial. (*Territory* v. *Burgess,* 8 Mont. 57, 19 Pac. 558, 1 L. R. A. 808; *State* v. *Anderson,* 14 Mont. 541, 37 Pac. 1; *State* v. *Mott,* supra.)

If McLean told the truth upon his *voir dire* and when he testified upon the motion for a new trial, he was a qualified juror. While it is imperative that the accused shall have a trial by an impartial jury, the mere probability that one of the jurors is incompetent is not sufficient to overthrow the verdict. A bare fear respecting the true state of the juror's mind has no place here. Error will not be presumed; after verdict, the defendant has the laboring oar.

"In passing on a motion for a new trial based upon the alleged incompetency of a juror, the lower court is called upon to exercise a sound legal discretion. In the absence of a clear showing of error in this regard, the appellate court will not interfere. (*Territory* v. *Bryson* [9 Mont. 32, 22 Pac. 147], supra; *State* v. *Anderson,* supra; *State* v. *Martin* [29 Mont. 273, 74 Pac. 725], supra.)" (*State* v. *Mott,* supra; *State* v. *Ingersoll,* 88 Mont. 126, 292 Pac. 250.)

We are convinced that the defendant had a fair and impartial trial. The evidence introduced to prove his insanity was indeed weak. It is hard to conceive that any level-headed jury would be impressed with it.

Murder in the commission of robbery was done. In the facts there is no extenuating circumstance; the circumstances each and all show the defendant planned and executed the crime with an abandoned and malignant heart fatally bent on mischief. No injustice has been done by the verdict. The order denying the motion for a new trial and the judgment are affirmed.

ASSOCIATE JUSTICES MATTHEWS and ANDERSON: We concur in both of the foregoing opinions.

MR. JUSTICE ANGSTMAN, Dissenting: It is a well-settled rule of law that, if a juror has formed or expressed an opinion previous to the trial to the effect that the defendant is guilty, or that he should be hanged, and conceals that opinion and the expression of it on his *voir dire* examination, and the defendant had no knowledge of it before trial, a new trial should be granted. (*United States* v. *Upham,* 2 Mont. 170; *Territory* v. *Kennedy,* 3 Mont. 520; *State* v. *Mott,* 29 Mont. 292, 74 Pac. 728; *Territory* v. *Chartz,* 4 Ariz. 4, 32 Pac. 166; *Ellis* v. *Territory,* 13 Okl. 633, 76 Pac. 159; *State* v. *Swafford,* 88 Wash. 659, 153 Pac. 1056; *Corley* v. *State,* 162 Ark. 178, 257 S. W. 750; *State* v. *Connor,* (Mo. Sup.) 274 S. W. 28; *People* v. *Ortiz,* 320 Ill. 205, 150 N. E. 708; *People* v. *Plummer,* 9 Cal. 298; *People* v. *Galloway,* 202 Cal. 81, 259 Pac. 332; *Fitzgerald* v. *People,* 1 Colo. 56; *Mask* v. *State,* 5 Okl. Cr. 191, 113 Pac. 995; *State* v. *Morgan,* 23 Utah, 212, 64 Pac. 356; *Fletcher* v. *Commonwealth,* 239 Ky. 506, 39 S. W. (2d) 972; *Baker* v. *Commonwealth,* 192 Ky. 478, 233 S. W. 1046; *Pointer* v. *State,* 24 Ala. App. 23, 129 So. 787; 16 C. J. 1152 et seq.; Wharton's Crim. Pl. & Pr., 9th ed., sec. 844.)

The reason for the rule is obvious. It was well stated in *People* v. *Plummer,* supra: "One of the dearest rights guaranteed by our free Constitution is that of trial by jury;—the right which every citizen has to demand, that all offenses charged against him shall be submitted to a tribunal composed of honest and unprejudiced men, who will do equal and exact

justice between the government and the accused, and, in order to do this, weigh impartially every fact disclosed by the evidence.''

The fact that juror McLean wrote the article in question is conceded. The juror conceded likewise that when he wrote, ''Did you notice how quickly our legal officers placed their hands upon the murderer?'' he had reference to defendant, Hoffman. He knew of none other who had been arrested. The meaning of the expression, ''Contrasting to this picture of wisely used talents is the picture of the miserable wretch that murdered defenseless and helpless George Burrell. He buried his talent very deep. And when the wheels of justice cease to grind his worthless carcass will lie to rot as deeply buried as was his talent,'' is clear and unambiguous. It can only mean that whoever killed Burrell should pay the death penalty. The two items, though written at different times, were sent to the press at the same time as parts of one article.

It is true, as stated in the majority opinion, that, if a talesman has conscientious scruples against the infliction of the death penalty, he should not be permitted to serve as a juror. This is because the death penalty is one fixed by law and the state is entitled to a jury which will abide by the law. It is to assure the state of a fair trial under the law. Conversely, if a juror has a fixed opinion before hearing the evidence that the death penalty, and that alone, should be imposed, he is equally disqualified. He in effect has a prejudice against the law as applied to that particular case which permits the punishment of life imprisonment. Here it should be noted that the punishment was not left to the court. The jury inflicted the death penalty. If it be conceded that the juror McLean could fairly try the issue of insanity, I fail to see how under any conceivable theory he could be said not to have formed or expressed a fixed opinion prior to hearing the evidence as to the penalty that should be imposed in case defendant were found guilty.

A newspaper is a powerful instrument in the molding of public opinion and sentiment, and no one appreciates it more

keenly than those engaged in that work. I think it is an extremely dangerous precedent to pronounce a juror qualified in a case in which he has taken such interest as to write an article such as the one before us (editorially, I may say, but under the guise of a news item) merely on the theory that it must have been but the flowery expression of abhorrence over the perpetration of a brutal murder.

It must be remembered, too, that the fact that McLean wrote the article was unknown to defendant and his counsel on the *voir dire* examination, and hence section 11962, relied upon in the majority opinion, relating to challenges, has no application.

In my opinion, a person making the statements contained in the newspaper article in question could not enter upon a consideration of the case with an open mind and do equal and exact justice between the state and the defendant.

MR. JUSTICE STEWART: I concur in the views of MR. JUSTICE ANGSTMAN, and join in his dissent.

Rehearing denied July 19, 1933, JUSTICES ANGSTMAN and STEWART dissenting.