STATE, Respondent, *v.* CRIGHTON, Appellant.

(No. 7,257.)

(Submitted June 2, 1934. Decided July 7, 1934.)

[34 Pac. (2d) 511.]

*Mr. John B. Tansil, Mr. Franklin A. Lamb* and *Messrs. Brown, Wiggenhorn & Davis,* for Appellant, submitted an original and a reply brief; *Mr. Horace S. Davis* argued the cause orally.

*Mr. Raymond T. Nagle,* Attorney General, *Mr. C. J. Dousman,* Assistant Attorney General, *Mr. C. W. Demel* and *Mr. Philip Savaresy,* respectively County and Deputy County Attorney of Yellowstone County, submitted a brief in behalf of the State; *Mr. Dousman* argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

This is an appeal from a judgment convicting the defendant of assault in the second degree, and from an order denying his motion for a new trial.

So far as applicable here, the statutory definition of an assault in the second degree is, that every person who "3. Wilfully or wrongfully wounds or inflicts grievous bodily harm upon another, either with or without a weapon; or, 4. Wilfully and wrongfully assaults another by the use of a weapon, or

other instrument or thing likely to produce grievous bodily harm, * * * is guilty of an assault in the second degree. * * * '' (Rev. Codes 1921, sec. 10977.)

1. The information originally charged that one Ronald Crighton, on or about the twenty-first day of October, 1933, "at the county of Yellowstone, State of Montana, committed the crime of assault in the second degree, in that the said Ronald Crighton then and there being, did then and there wilfully, wrongfully, unlawfully, intentionally and feloniously assault one Vernon Smalley by striking and wounding him with a revolver, a more particular description of which revolver is to this informant unknown, and inflicting upon him, the said Vernon Smalley, grievous bodily harm, with the intent in him, the said Ronald Crighton, to inflict upon the said Vernon Smalley bodily harm, contrary,'' etc.

To this information the defendant pleaded not guilty. After the jurors had been sworn upon their *voir dire* examination, the county attorney asked leave to amend the information by inserting after the words "Ronald Crighton," in the fourth line from the bottom of the information, the additional words, "the said Ronald Crighton, did then and there wilfully, wrongfully, unlawfully, and feloniously inflict upon the said Vernon Smalley grievous bodily harm.''. To this counsel for defendant objected, asserting that the proposed amendment, made at the opening of the trial and without notice, was of substance and would raise the grade of the offense from that of a misdemeanor, assault in the third degree, to that of a felony, assault in the second degree. The court permitted the amendment.

The information as originally drawn charged the defendant with assault in the second degree. It was specifically alleged that the defendant wilfully, wrongfully, unlawfully, intentionally and feloniously assaulted Vernon Smalley, inflicting upon him grievous bodily harm, and with the intent to do so. The additional matter did not change the legal effect of the information.

2. The only other errors which it is necessary to consider are: (1) That the court erred in admitting in evidence an alleged confession of the defendant, designated as State's Exhibit No. 6; and (2) erred in sending the same to the jury after it had retired to deliberate. Preliminary to the discussion of these alleged errors, a brief statement of the facts is necessary.

Two women, Clara Johnson and Edna Haynes, otherwise called Mrs. Crighton and Mrs. Campbell, were conducting what the witnesses term a "party house," called "The Palms," in Billings. Whether Edna Haynes was the wife of the defendant presents an important question, as will appear presently. "The Palms" contained an office-room, bar-room, dance-hall, "toilet," kitchen, and bedroom. The defendant had furnished Edna Haynes $100 which she contributed to the enterprise. The testimony indicates that the principal business of The Palms was selling intoxicating liquor, which was stimulated by dancing girls provided by the "house." The girls urged their partners to drink and were paid a percentage of the amount received for the drinks which they caused to be sold. Edna Haynes and her sister Myrtle Hivley were dancers. Those who danced with the girls deposited money in a "kitty" from which the musicians obtained their compensation. At the time Vernon Smalley and Dudley A. Smalley were the musicians.

It appears that the defendant and Edna Haynes had been living together for a number of years, and at the time of the alleged assault defendant was renting a house in Billings which he testified was the family home. While at Williston, North Dakota, on business, defendant heard Vernon Smalley had been paying attention to his wife; that is, to Edna Haynes. Defendant returned to Billings on the evening of October 19 and went to The Palms, but did not enter the house; he went about the outside. Upon glancing through the kitchen window he observed the bedroom and saw Smalley sitting or lying on the bed with Edna Haynes. He did not enter the building at that time, but on the evening of the 20th he went back to

The Palms wearing a mask, armed with two revolvers and carrying a coil of rope. This time, he said, he saw his wife and Smalley in bed covered by bedclothes completely to their necks. The light in the bedroom was put out, whereupon defendant entered, turned on the light, and told Smalley to lie where he was. Instead, Smalley rose to a sitting position; but whether he made any demonstrations against the defendant is not certain, as the evidence is in conflict.

Defendant's version of what took place is that Smalley "came up at him" with his fists clenched, and defendant "tapped" him with a revolver on the side of the head. There is no doubt that the blow caused a slight fracture of Smalley's skull. The woman jumped from the bed and left the room. After the liaison was thus broken up, the defendant left the room. The blow struck is the basis of the state's charge of assault in the second degree.

The defendant was arrested the next morning and apparently made two statements, or confessions. One was placed before the jury by Val Lechner, chief of police of Billings. As related, it consisted of a conversation between Mr. Lechner and defendant, and is said to have been taken down by the county attorney's stenographer and transcribed. It was not signed. Counsel for defendant at the trial demanded that it be produced; the county attorney said it would be. Nevertheless Mr. Lechner proceeded to give the testimony of defendant in narrative form. The chief of police testified he took a book from defendant, written by him as a diary, narrating his version of the events of October 20 and 21, which, without objection, was read to the jury and introduced as Exhibit 1. The rope and mask were introduced as Exhibits 2 and 3. X-ray films were designated as Exhibits 4 and 5.

The next witness for the state was W. W. McKenzie, undersheriff of Yellowstone county. He testified that he was in the county attorney's office on the morning of October 21, 1933, when a statement was read to the defendant. Some corrections were made in it at the defendant's "instigation," the witness said. The defendant was asked if he would sign the

statement, but he declined to do so. McKenzie then said defendant was asked by the deputy county attorney "whether the statement was true or not; whether it was the truth, and he said it was."

When the writing was offered in evidence as State's Exhibit 6, Mr. McKenzie, being interrogated by defendant's counsel, said, "No, Mr. Lechner and I were testifying to separate occurrences. No, sir, I was not present at the time Mr. Lechner has testified about this morning. No, sir, he was not present at the time I have just testified about." Objection was then made in behalf of defendant to the introduction of the proposed exhibit upon the foundation laid, for the reason that it was not competent; "the exhibit being in the form of an alleged confession, and there being nothing to justify its admission at the present time." Thereupon the judge said the exhibit would be received in evidence except the first paragraph, which was not admissible, and he "had marked it out in pencil on the first page" (the pencil lines did not in the least obscure the legibility of the matter sought to be stricken); he also observed that "where it says the witness signed—that is not admissible in evidence; the last part is not." (That portion was cut from the writing.) With these alterations the writing was read in evidence over the objection of the defendant, counsel saying: "There is nothing whatever to warrant the admission of the same in evidence." The part stricken out in pencil by the court reads as follows:

"Affidavit.

"State of Montana, County of Yellowstone, ss.

"Ronald Crighton, being first duly sworn and being first duly advised by the assistant county attorney of his constitutional rights and not being promised immunity or any inducement whatever, makes the following statement of his own free will:"

After the writing, except those parts which were "stricken out" by the court, was read to the jury, the witness McKenzie said there was "nothing else in particular that he knew about the case other than he had testified to." Upon cross-examina-

tion he said, "Mr. Crighton refused to sign the document that had been read to the jury. Mr. Lechner was not there at the time I was there; no, sir. I think that was a day or two after Mr. Lechner was in there, no one else was there besides myself; Mr. Saveresy and Mr. Crighton. Mr. Demel was not there."

Exhibit No. 6 purports to contain a pretty full narration of the activities of the defendant during the seven or eight years he was acquainted with Edna Haynes. He said the two lived together as man and wife in Williston, North Dakota, for four or five years. He supported her, and they lived together just the same as man and wife. They had a little trouble once in a while, but she never left him. He told her several times if she wanted to leave, to settle up and she could leave, but she did not. She wanted to start a party house, so he gave her the money, about $100 or more. He said, referring to the Sunday before the difficulty, "When we came up here Sunday we got along fine. I wanted her to go back with me on this trip, but she said 'No.' It kind of seemed suspicious to me then, so I doubled back and I arrived here Tuesday, October 19, 1933." He then went on to describe what he had seen in the house, and that he went back again on Friday night, October 20, about midnight.

All of the writing, except toward the end, is in narrative form. Some alterations appear in the declaration, but what particular ones defendant authorized we cannot say from the record. Therein he referred to Edna Haynes as his common-law wife. He said he figured they would be getting married some day. In answer to the question, "Was there anything said between you that you would take her as your wife and live together as man and wife to the end?" he answered they talked something about it, but she never agreed to it. "We never came to any agreement between us that we would live together as man and wife." (As to the materiality of this statement concerning consent to enter the marriage relation, see sec. 5695, Rev. Codes 1921; *Shepherd & Pierson Co.* v. *Baker*, 81 Mont. 185, 262 Pac. 887; *Welch* v. *All Persons*, 85 Mont.

114, 278 Pac. 110.) He gave his version of how he came to enter the house and of his having hit Smalley with the pistol; then he said, "Fearing that he was getting mad and might hurt someone he got in his car, went to south bridge and threw the pistols in the river."

We do not find anything definite in the record which indicates the circumstances under which the writing was made. There is nothing to show that defendant made it voluntarily or whether it was induced by promises held out. He was in the hands of the officers of the law, and some statement of the facts surrounding the making of the deposition should have been given to the district court so that it might rule advisedly upon the point whether the confession was or was not admissible.

We have examined the decisions in *State* v. *Sherman*, 35 Mont. 512, 90 Pac. 981, 119 Am. St. Rep. 869, *State* v. *Berberick*, 38 Mont. 423, 100 Pac. 209, 16 Ann. Cas. 1077, *State* v. *Guie*, 56 Mont. 485, 186 Pac. 329, and *State* v. *Dixson*, 80 Mont. 181, 260 Pac. 138, from which we have no doubt that the writing, if admissible in evidence at all, would be deemed a confession; but before being admitted in evidence a proper foundation for its introduction was essential. (*State* v. *Dixson*, supra; *State* v. *Hoffman*, 94 Mont. 573, 23 Pac. (2d) 972.) The authorities on the subject are well summarized in 15 C. J. 717: "A confession of guilt by accused is admissible against him when and only when, it was freely and voluntarily made without having been induced by the expectation of any promised benefit nor by the fear of any threatened injury."

Moreover, there were alterations in Exhibit No. 6 which were not explained except by the assertion of the witness McKenzie, who said some corrections were made at the "instigation" of the defendant. Just what those were, as said before, we do not know. Section 10617, Revised Codes 1921, provides: "The party producing a writing as genuine which has been altered, or appears to have been altered, after its execution, in a part material to the question in dispute, must account for the appearance or alteration. He may show that the alteration was

made by another, without his concurrence, or was made with the consent of the parties affected by it, or otherwise properly or innocently made, or that the alteration did not change the meaning or language of the instrument. If he do that, he may give the writing in evidence, but not otherwise.'' That statute is made directly applicable to the trial of criminal cases by section 11977, Revised Codes 1921. The admission of this so-called declaration was error.

3. The defendant, testifying for himself, said Exhibit 6 was inaccurate. He testified that Edna Haynes was his wife, and many witnesses supported his testimony in that respect. They came from Williston, from Bainville, from Billings. Arthur Wells, brother of the woman, was a strong witness for defendant upon that point.

Defendant sought to maintain his defense upon the ground that he merely exercised a husband's right in protecting his wife from the lascivious embraces of her seducer. And while to decent folk that right meets with greater favor in circumstances where virtue may be expected rather than where vice rears its ugly head, the law speaks with controlling voice in both.

The court instructed the jury without objection that: ''The law presumed that if the woman Edna Campbell or Haynes and the defendant deported themselves as husband and wife, they have entered into a lawful contract of marriage. This presumption has the force and effect of evidence. It may be controverted by other evidence, direct or indirect; but unless so controverted you are bound to find according to the presumption that the defendant and Edna Haynes or Campbell were married and husband and wife at the time of the alleged assault charged herein.'' Other instructions were given along the same line.

The court also told the jury that: ''If the woman Edna Haynes or Campbell was the wife of the defendant at the time of the alleged assault, and if the defendant caught her and the witness Smalley in such a position and under such circumstances as would have led a reasonable man to believe that

they had just indulged in an act of sexual intercourse, or were about so to do, and if further the witness Smalley by his improper conduct created such situation, if any, then you are instructed that the defendant had the right to protect his marital rights, to enter the room where the witness Smalley and the woman then were, and to use such reasonable force under the circumstances as was necessary to break up the liaison, if any."

4. After the arguments were concluded, the county attorney moved the court to send all the exhibits which had been received to the jury. Counsel for defendant objected, and especially to State's Exhibit No. 6, "for the reason that to do so is to submit to the jury a portion of the evidence to be constantly before them in writing during their deliberations, to the exclusion of the rest of the record which rests in the parol testimony of the witnesses and is now, alone, to be found in the stenographer's notes, and is prejudicial to the defendant in that particularly State's Exhibit No. 6 is a presentation of the case upon the theory and from the standpoint of the state, to the exclusion of the defendant's version and his testimony bearing upon the same point covered by his statement, and particularly upon the inaccuracies contained in that statement and the reasons why he did not sign it." The court took the matter under advisement. It was then the noon hour. After lunch the judge sent to the jury Exhibits 1, 4 and 5, but refused to send Exhibits 2, 3 and 6 and Defendant's Exhibit "B," which he retained; but the bailiff came to the judge and stated that the jury wished Exhibit 6, and about 2:30 P. M., after having examined the authorities, the judge sent Exhibit No. 6 to the jury. This was error. In the first place, the evidence which the judge had stricken out with lead pencil, because it was not admissible in evidence, went to the jury with Exhibit 6. Thus the jury received evidence prejudicial to the defendant, who suffered a serious infraction of his rights. In the second place, counsel's reasons assigned in objecting to the admission of the exhibit were sound.

Furthermore, section 12011 of the Revised Codes of 1921 ▮ provides: "Upon retiring for deliberation, the jury may take with them all papers (excepting depositions) which have been received as evidence in the cause, or copies of such public records or private documents given in evidence as ought not, in the opinion of the court, to be taken from the person having them in possession. They may also take with them the written instructions and notes of the testimony or other proceedings on the trial, taken by themselves, or any of them, but none taken by any other person."

The Attorney General argues that, as Exhibit No. 6 was not a deposition, it was proper for the court to submit it to the jury, it being one of the papers which was received in evidence in the cause, and he calls attention to the statutory definition of a deposition, which is: "A deposition is a written declaration under oath, made upon notice to the adverse party for the purpose of enabling him to attend and cross-examine." (Sec. 10633, Rev. Codes 1921.) He argues that it was not made upon notice to the adverse party, and was not a written declaration under oath. The defendant, if he chose, might waive notice, might attend, be sworn and answer all questions put. Whether the declaration was under oath the record does not certainly disclose. It is stated in the matter stricken from the declaration by the court, afterwards given to the jury, that "Ronald Crighton being first duly sworn. * * * " As to its being a deposition, if the defendant, under oath, made the statements included in the writing, which later he stated to be true and correct, although he refused to sign the declaration, it was to all intents and purposes a deposition.

A statute which excludes a deposition should be held to exclude a declaration which to all intents and purposes is a deposition. Some attention should be given to the latter part of section 12011, supra, which reads: A jury may "take with them the written instructions and notes of the testimony or other proceedings on the trial, taken by themselves, or any of them, but none taken by any other person." Now, notes of

testimony taken by someone else before or during the trial may not be taken to the jury-room. For illustration: If a defendant had made a confession which had been committed to writing by a stenographer but neither sworn to nor signed by the defendant, it may be read to the jury by the stenographer, but the writing may not be permitted to go to the jury as an exhibit. That portion of section 12011, last quoted above, evidently refers to contracts, bills of sale, deeds, public instruments and the like, which are a part of the subject matter of the controversy.

The judgment is reversed and the cause is remanded to the district court of Yellowstone county for a new trial. Remittitur forthwith.

ASSOCIATE JUSTICES MATTHEWS, STEWART and ANDERSON concur.

MR. JUSTICE ANGSTMAN, being absent, takes no part in the above decision.