STATE, RESPONDENT, *v.* DRYMAN, APPELLANT.

No. 9325.

Submitted January 5, 1954. Decided April 29, 1954.

269 Pac. (2d) 796.

580

Mr. Justices Anderson and Angstman dissented.

Mr. Jerry J. O'Connell, Great Falls, for appellant.

Mr. Arnold H. Olsen, Atty. Gen., Mr. John L. McKeon, Asst. Atty. Gen., Mr. Louis P. Donovan, Sp. Asst. Atty. Gen., for respondent.

Mr. O'Connell and Mr. McKeon argued orally.

MR. JUSTICE FREEBOURN:

Frank R. Dryman, also known as Frank R. Valentine, charged by information in Toole County, Montana, with the crime of murder, was by a jury on January 11, 1953, found "guilty of murder in the first degree," which jury left "his punishment to be fixed by the court." By judgment of the trial court, pronounced on January 13, 1953, it was "ordered, adjudged and decreed that the said Frank R. Dryman, also known as Frank R. Valentine, be * * * hanged by the neck until dead." From this judgment the defendant has appealed.

The crime with which defendant was charged was alleged to have been committed on April 4, 1951, according to the allegations of the information filed April 11, 1951. On April 12, 1951, without benefit of counsel, the defendant, then nineteen years of age, entered a plea of guilty to the charge of murder.

· After taking evidence to determine the degree of murder, the trial court found defendant guilty of murder in the first degree and by its judgment of April 12, 1951, sentenced defendant to be, on June 1, 1951, "hanged by the neck until dead."

Thereafter the defendant having secured counsel moved to set aside the judgment of April 12, 1951, and be allowed to enter a plea of not guilty, which motion was denied. Upon appeal

from the denial of such motion, this court by its decision of February 15, 1952, in the case of State v. Dryman, 125 Mont. 500, 241 Pac. (2d) 821, remanded the cause to the lower court with directions to withdraw the plea of guilty and enter a plea of not guilty. The lower court did this and the plea of not guilty was entered on July 25, 1952. Defendant's trial by a jury followed, resulting in the verdict of guilty, on January 11, 1953, and the judgment of January 13, 1953.

In August of 1952, and before trial to a jury, defendant petitioned and moved the trial court for a change of venue and to change the place of his trial, on the grounds: "That the people of the County of Toole, State of Montana, are so prejudiced against the said defendant that he cannot have a fair trial; [and] that it is impossible to obtain a jury in the County of Toole, State of Montana, that has not formed an opinion, as to the guilt or innocence of the said defendant, such as would disqualify them as jurors."

By order of the trial court dated October 30, 1952, it appears that "a hearing on the defendant's request for change of place of trial was had on October 29, 1952, at which hearing evidence, both documentary and oral, was introduced by plaintiff and defendant, and * * * it is ordered that defendant's petition for change of place of trial be denied, and that the trial * * * be held in Toole County, Montana."

Defendant in his appeal to this court asserts that the refusal of the trial court to grant a change of venue and his petition for change of place of trial was error, and that such change of place of trial should have been granted.

At the hearing on the petition and motion for change of place of trial, held October 29, 1952, defendant's exhibit 1 went into evidence. It consisted of one sheet of white paper 10 inches in width and 15 inches in length, blank on one side and with printing and two pictures in red ink on the other side, several hundred copies of which were circulated in Shelby, Montana. At the top appeared the word "Extra" which was 8 inches in length with the letters $1\frac{5}{8}$ inches in height. Under the word "Extra" ap-

peared "The Shelby Promoter and Tribune of Shelby" after which appeared the printing and pictures. Stamped on the sheet in blue ink appeared the words "Compliments The Shelby Promoter." The Shelby Promoter is a newspaper published at Shelby, Montana, with a circulation, as appears from the evidence, as of April 4, 1951, to July 1, 1952, of: 1655 in Toole County; 75 in Glacier County; 80 in Pondera County; and 115 in Liberty County.

Space will not permit setting out the entire "Extra" here. It suffices to say that one of the pictures is that of the presiding judge and the other that of the defendant with "Killer" over defendant's picture. Four columns, 8½ inches of small print, purport to detail the story of the crime and of what took place in the courtroom when the defendant was first sentenced to death following his plea of guilty. The article states: "The unemotional Dryman, cold blooded killer of Clarence C. Pellett * * * took eight shots at Pellett when the begging Four Corner oilman attempted to run away from the angry hitch-hiker. * * * all of the bullets entered from the back side. Six of the seven bullet wounds were fatal * * *.

"Court Room Packed. People began milling into the Toole County District Courtroom about a half hour before the testimony [taken to determine what degree of murder defendant was guilty of] which got under way at 2:00 p. m. By 1:55 all seats were taken and there was standing room only * * *. Many high school students took seats on the floor for the hearing. Cars lined from the bowling alley to the hospital, a distance of about a block and a half and were parked in every available spot around the court house. Inside spectators were quiet until the passing of the sentence, when they rapidly filed out of the court room to gather and talk in groups in muted or excited tones, depending on their reactions. * * *

"Justice is Done. In one brief week a killer has been tracked down and captured, a confession and complete evidence obtained and sentence of death pronounced.

"It was almost like the swift and terrible justice of the old

Vigilante Days except this was within the formality of the law, with the prisoner being accorded council and also full access to a jury trial or change of venue—if he had asked for it. But he did not. He must have pre-judged in his own heart the black guilt in which he perpetrated the most dastardly deed in the history of Toole County. Either that, or as it appeared he was so steeped in criminal tendencies that nothing could appeal to his warped and stony mind.

"Killer had been in Trouble Before. Frank Dryman, alias Frank Valentine, was sentenced to juvenile court * * * at the age of 16 for robbing a liquor store * * * the Nevadan was given an undesirable discharge, and while in service his family moved to Vallejo, California * * *.

"It's bitterly ironical that the slayer was a former neighbor and friend of Mrs. C. J. Sharp (a sister of the deceased), a kind woman who was his friend on many troublesome occasions.

"County officials were undecided following the sentencing whether to keep Dryman in custody at the Toole County jail or remove him to the state penitentiary at Deer Lodge."

The county officials may have been "undecided following the sentencing" as to where to keep the defendant, but such indecision appears to have crystallized into action after the appearance of the red "Extra" and resulted in a written request made by the Toole County sheriff, and approved by the trial judge, to the Montana state board of prison commissioners, at the state capitol, in Helena, Montana. This written request in the form of an affidavit and petition, signed by the sheriff of Toole County on June 5, 1951, was presented to the Montana state board of prison commissioners and is as follows: "The facilities of Toole County jail are not adequate to afford proper protection for the above-named defendant [Dryman] during the period of time before the above captioned case can be concluded * * *.

"The undersigned, C. O. Dunstall, sheriff of Toole County, Montana, respectfully requests that your honorable Board authorize the removal of the above-named defendant to the state penitentiary at Deer Lodge, Montana * * *"".

It appears that the sheriff and one other witness appeared and testified before the prison board. Referring to such appearance before the board, the sheriff testified: ''I told them at the time of the murder there was high feeling'' against the defendant.

As a result of such request, as shown by the record, the state prison board on June 6, 1951, passed the following resolution: ''Whereas: In view of the feeling in Toole County and adjacent counties against the defendant [Dryman], the Board was of the opinion that the only safe place for the defendant until the Supreme Court has acted on the appeal for a stay of execution would be the Montana State Prison.

''Now, Therefore: Be it resolved that the Board of Prison Commissioners for the State of Montana authorize and direct the Warden of the Montana State Prison to accept custody of the defendant, Frank R. Dryman, until such a time as the State Supreme Court has acted on his appeal and he is either required to suffer the penalty given him in the District Court, or is required to appear again for further court proceedings. In either instance, he is to be delivered to the sheriff of Toole County only.''

The record discloses the following discussion between the trial judge and one of counsel for defendant. ''Mr. O'Connell: If it please the Court, I find that the record does not contain any copy of the petition for removal to Deer Lodge. The Court: Well, I signed or endorsed the original which went down to the State Board of Pardons at Helena, and there is no copy in the record. I checked that myself. However, your copy has been offered and received by the court in evidence. I was familiar with it before because I endorsed or signed it when it was first made. Go ahead.''

It appears that the defendant is still being kept in the state penitentiary.

Placed in evidence also was an article which appeared ''in the issue of the Shelby Promoter dated November 22, 1951,'' which appears to be comments on proceedings of and matters filed in

the first appeal to the Supreme Court of Montana, before such appeal was argued or decided by this court. In part such article reads: "After three postponements attorneys W. M. Black and Jerry J. O'Connell finally presented their briefs before the high bench while County Attorney Hoyt remained in complete darkness as to what was going on. Only through the newspaper columns could he learn about the strange case in which a 20 year old hitchhiker from California killed the father of six children when he 'begged for mercy.'

"Hoyt will now have an opportunity to file his briefs after he receives a copy of the arguments submitted to the court by Black and O'Connell. It may be early in 1952 before the hearing on the appeal will be heard by members of the high bench who have been lenient with the defense in allowing them extra time to prepare their case.

"History of the case is well known to Toole County residents although several have been wondering about the shenanigans [trickery, foolery, evasion] down at Helena. * * *

"Attorney Black and O'Connell went as far as to say that Dryman's trial [the taking of evidence to determine the degree of murder after the plea of guilty] 'was but briefly removed from mob violence.' * * * They continued in their charge that the case was permeated with an 'atmosphere of lynch action, vindictiveness and hot-blooded disregard of the rights guaranteed every defendant.' * * *

"Dryman's request for a new trial, turned down by Judge R. M. Hattersley, came after Governor John W. Bonner twice refused to grant clemency or suspend or stay execution of the death sentence including an examination of the youth by three state psychiatrists and a psychologist who said Dryman was sane at the time of the brutal killing. Said the examining psychiatrists and psychologists, 'There is no question about the guilt of the defendant or the brutality of his crime.' * * *

"It's up to County Attorney Hoyt to file his answer to the strong-tongued statements of the defense counsel.

"Whether he'll receive as lenient treatment as the defense

has from the high bench will be told only through time. Why they keep the county attorney in the dark as to what goes on, must have some sort of a significance.

"It may come to light in the months to come.

"Meanwhile, the slaying of an innocent cafe operator who befriended a hitchhiker by giving him a ride in his comfortable automobile and 'begged for mercy' before the youth pulled his .45 calibre automatic and pumped seven shots into his lifeless body receives plenty of laxity, newspaper space, but no definite action for the atonement of the hideous crime."

At the hearing upon the request for a change of place of trial witnesses were sworn and testified. Those called by the defendant testified he could not have a fair trial in Toole County while the state's witnesses testified he could.

It is significant to note, however, that many of the state's witnesses testified that they thought the defendant was guilty. As one state's witness put it: "I think the general opinion is that the man confessed the crime and the court passed judgment on him and they went along with the court. * * *

"Q. In other words, do you believe that the same feeling exists today that existed a year and a half ago? A. I would say so." Another state's witness expressed himself this way: "I didn't form any opinion until the judge passed sentence that he was guilty. I took it for granted that he was." Another state's witness, speaking of discussions with other people, said: "I think they believed in the opinion of the court.

"Q. They felt the man was guilty and ought to be hung? A. They believed he was guilty." Another state's witness, speaking of other persons he had talked to, said:

"Q. When you discussed with them did they say the defendant was guilty or not? A. Before or after the trial?

"Q. Before he was sentenced to hang, what did they say? A. I believe all of them expressed the opinion that he was guilty.

"Q. And after he was sentenced? A. Believed that he was sentenced correctly."

One of the jurors who sat in judgment of the defendant, after

challenge denied, when examined as to his qualifications to sit as such juror, testified:

"Q. When you and your wife discussed the case for instance, did you express any opinion at that time as to the guilt or innocence of the defendant? A. We thought the judge had the right idea.

"Q. You thought the judge had the right idea? A. Yes, sir.

"Q. What do you mean by that? A. Well, he found him guilty.

"Q. And sentenced him to hang. Is that what you mean? A. Yes, sir."

R. C. M. 1947, sec. 94-6901, provides in part that: "A defendant * * * may be awarded a change of place of trial upon his petition, on oath * * * setting forth that he has reason to believe that he will not receive a fair trial in the court in which [his case is pending] * * * which petition shall state the facts upon which the same is based, * * *

"4. That the people of the county are so prejudiced against the defendant that he cannot have a fair trial; or,

"5. That it is impossible to obtain a jury in the county that has not formed an opinion, as to the guilt or innocence of the defendant, such as would disqualify them as jurors."

Article III, sec. 16, Montana Constitution, guarantees that: "In all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel; to demand the nature and cause of the accusation; to meet the witnesses against him face to face; to have process to compel the attendance of witnesses in his behalf, and a speedy public trial *by an impartial jury* of the county or district in which the offense is alleged to have been committed, subject to the right of the state to have a change of venue for any of the causes for which the defendant may obtain the same."

R. C. M. 1947, sec. 94-4806, provides: "In all criminal prosecutions the accused shall have the right—

"1. To appear and defend in person and by counsel;

"2. To demand the nature and cause of the action;

"3. To meet the witnesses against him face to face;

"4. To have process to compel the attendance of witnesses in his behalf;

"5. A speedy public trial *by an impartial jury* of the county or district in which the offense is alleged to have been committed, subject to the right of the state to have a change of venue for any of the causes for which the defendant may obtain the same."

It can be seen by reading the foregoing sections of our statutes ■ and Constitution that, upon a proper showing, in order to secure an impartial jury or a jury that has not formed an opinion, as to the guilt or innocence of the defendant, such as would disqualify them as jurors, or for any other cause stated in section 94-6901, either the state or the defendant is entitled to a change of venue or change of place of trial.

To deny a defendant in any criminal case the right to a change ■ of venue or place of trial from a county where he cannot be tried by an impartial jury is to deny such defendant the fair trial guaranteed by Article III, sec. 27, of our State Constitution which provides that: "No person shall be deprived of life, liberty, or property without due process of law."

The action of the trial judge and sheriff in having the defendant kept in the state penitentiary, and not in the Toole County jail, followed by the finding of the state prison commission, consisting of the governor, secretary of state and attorney general, in its resolution granting the request of such judge and sheriff that, "In view of the feeling in Toole County and adjacent counties against the defendant, the Board was of the opinion that the only safe place for the defendant * * * would be the Montana State Prison," leads to the conclusion that there was such a feeling and prejudice in Toole County that defendant might have been lynched if he had been kept in Toole County.

No one in a county, speaking generally, has a better opportunity than the sheriff, with his ears, and those of his deputies, to the ground, coupled with their many personal contacts, so-

cially, politically and in the line of duty, to finger the pulse of its people and determine their sentiments and feelings on any matter of great or public interest. It was after reading the sheriff's affidavit and request, and hearing him and another witness from Toole County, that the state prison commissioners concluded that "the feeling in Toole County and adjacent counties against defendant" was such "that the only safe place for the defendant * * * would be the Montana State Prison."

Nor can one lose sight of the fact that the trial judge, a jurist of long experience and discerning judgment, who acts, not hastily but only after calm and deliberate consideration also recognized the danger to defendant and approved the removal of defendant to the state penitentiary for safe keeping.

In seeing that defendant was kept in the state penitentiary thus preventing possible mob violence, the sheriff and trial judge did the right and proper thing.

The red "Extra" and the news article of November 22, 1951, go beyond the mere printing of news and the dissemination thereof. The conclusions and thoughts of the author tended to fan the flame of high feeling against the defendant rather than to quench it. The November 22nd article tended to give its readers the impression that the law and its procedures were deliberately, by trickery, delay and favoritism, defeating justice. It sought quicker action in bringing about the hanging of the defendant than the law could in due course provide.

The general morality of the law is higher than many good people suppose. Such good people are not without conscience but without sufficient light. Left to such writings as that of November 22nd such light would be entirely extinguished.

Our government is one of law which is no mere empty formality to be followed in one case and overlooked in another. Courts are sworn to see that our laws and the provisions of our Constitution are carried out, and that every right accorded thereby to a defendant be given him, regardless of expediency, dissatisfaction of others, or benefit to be gained or lost. If this were not so, the will of man would prevail. Then, like the seasons

of the year one following the other, as the wheel of time turned and men changed, what would be just today would be unjust tomorrow. No rule to guide or measure man's conduct would exist.

True, the law moves slowly and deliberately in its desire to see justice done. It may seem to delay, but it does not stop or prevent justice. It does justice. Like pure gold it needs no gilding. Men, whomever or wherever, must abide by it. If dissatisfied with a law, man should change it, not violate it or encourage its violation.

The question of insanity, as shown by the record, is a serious one and none but an impartial jury should pass upon it.

One who reads the record in this case must come to the conclusion that the wide-spread and deep-seated opinion in Toole County is that defendant is guilty and should be hanged and that such opinion largely arises from defendant's plea of guilty first made, followed by the trial court's first sentence of death.

Under the circumstances here existing, it seems natural that such opinion should exist in Toole County. However, the existence of such opinion, as shown by the laws and Constitution heretofore set out, entitles the defendant to a change of venue and place of trial.

For the reasons staetd the judgment of conviction is reversed and set aside, and the cause is remanded to the district court for a new trial, with directions that the change of venue and place of trial be granted from Toole County to some other county not adjacent thereto.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICE BOTTOMLY, concur.

MR. JUSTICE ANDERSON: (dissenting).

The majority opinion admits the fact that the record before this court leaves little doubt that it was the defendant who actually killed the decedent. Little wonder that any man, no matter where he resides, might be exercised, because the killing of Clarence Pellett was shockingly brutal. It would seem in the

circumstances that there was left for the jury here only that their minds then be open to the question of whether or not the defendant, at the time of the killing, was sane and thus responsible under the law for his acts, or insane and thus not responsible for his acts.

It appears that the majority opinion is bottomed upon the contents of certain newspaper items. It should be remembered that the news items referred to in the majority opinion were written, distributed and read at a time more than a year prior to the hearing for a change of venue.

The newspaper items, as I read them, differ little from the usual comments in news items where a defendant pleads guilty to a murder and is sentenced to hang. The newspaper confined itself generally to circumstances having to do with the killing of Clarence Pellett and the proceedings in the district court, along with the added color and remarks usually made by newsmen when an occurrence of sensation comes about in a community. I believe that a newspaper should have a wide latitude of expression and if its use goes beyond normal expression, the local district judge is in a better position to determine its effects than we are.

The application for change of place of trial in a criminal case is one addressed to the sound discretion of the trial court, and unless there has been a clear abuse of discretion its ruling will not be disturbed. State v. Hoffman, 94 Mont. 573, 23 Pac. (2d) 972.

In the case of State v. Bess, 60 Mont. 558, 199 Pac. 426, 429, this court said: ''The publication of an account of a killing, and even intimating that the defendant is the guilty party [here the defendant, before the news accounts were made, had pleaded guilty to the murder], is of itself not to be regarded as a sufficient ground for the transfer of the case to another county for trial. Newspapers do, no doubt, affect public opinion in matters upon which they take a decided stand; but before their effect can be pronounced so baneful and highly prejudicial as to warrant a change of venue, it must be shown that they were

passionate enough to excite undue prejudice, to the extent of rendering it impossible for an accused to secure a jury free from exception.'' No such showing is made here. In fact, if the case law of this state and the facts adduced at the hearing mean anything, the rule announced in the Bess Case is applicable.

As pointed out above, the hearing on the motion for change of venue was held on October 29, 1952, a year and one-half after the killing of Clarence E. Pellett and the news accounts followed shortly thereafter.

The petition for change of venue was supported by affidavits and testimony of four persons, two of whom were defendant's attorneys. In opposition to the change of venue there were 25 affidavits and several witnesses who testified, all to the effect that there was no feeling of hostility or prejudice such as to prevent a fair trial.

There is a long line of cases in which the question of a change of venue has been before this court, and a study of them convinces me they have been ignored by the majority of this court in the instant case, and in effect overruled.

Language used in the case of State v. Searle, 125 Mont. 467, 239 Pac. (2d) 995, 999, is helpful here. It was said in that case: ''It is well known that prejudice and indignation existing at and immediately after the commission of a heinous crime often subsides with the passage of time.'' Here a year and one-half had passed before the hearing was had.

In the instant case the voir dire examination of the jury disclosed that of the 34 jurors called, 10 were peremptorily challenged by defendant, one by the state, and eight were excused because they had formed an opinion upon the merits of the case. In State v. Bess, supra, where the situation regarding the voir dire examination of jurors was similar, although more compellingly in favor of Bess, the court said: ''This fact alone goes a long way in overcoming the charge that the court abused its discretion by refusing to change the place of trial.''

The majority opinion alludes to the fact that juror Johannson had formed an opinion in regard to the guilt or innocence of

the defendant and therefore should not have sat on the jury. Johannson's statement was to the effect that he thought the judge had the right idea at the time that the judge had sentenced the defendant to hang upon his plea of guilty; however, upon voir dire examination he was asked the following questions and gave the following answers:

"Q. Now then you have changed your opinion since the court passed sentence upon the defendant. You have changed your opinion since that time. A. Well, yes, as long as he is going to get a new trial we have to go by the evidence.

"Q. In spite of the opinion you previously had on the evidence you would be able to give the defendant a fair and just trial? A. Yes, sir."

A similar question has been before this court in the cases of State v. Sheerin, 12 Mont. 539, 31 Pac. 543, 33 Am. St. Rep. 600, and State v. Howard, 30 Mont. 518, 77 Pac. 50, and in other cases. The particular statute involved is R. C. M. 1947, sec. 94-7119.

It is clear that though the prospective juror Johannson may have had an opinion at the time of the former trial, he testified on voir dire that his mind was open and under the statute, the juror was clearly competent. See State v. Juhrey, 61 Mont. 413, 202 Pac. 762.

Counsel for the defendant has assigned a great many other errors in his brief, some of which suggest serious questions. However, since they have not been discussed in the majority opinion no useful purpose would be served if I were to discuss them. I think that the points touched upon in the majority opinion are insufficient to reverse the lower court in view of the authorities herein announced.

MR. JUSTICE ANGSTMAN:

I concur in the foregoing dissenting opinion of Mr. Justice Anderson.