The STATE OF MONTANA, Plaintiff and Respondent, v.
GAIL BORDEN GREEN, Defendant and Appellant.

No. 10626

Submitted December 11, 1963. Decided January 21, 1964.

388 P.2d 362

L. R. Bretz, William Conklin (argued), Great Falls, for appellant.

J. Fred Bourdeau, Chief Deputy County Atty., John F. Iwen, Deputy County Atty., Great Falls, Alfred B. Coate, Asst. Atty.

Gen. (argued), Forrest H. Anderson, Atty. Gen., Helena, for respondent.

MR. JUSTICE JOHN C. HARRISON delivered the Opinion of the Court.

The defendant was tried and convicted of the crime of "Attempt to commit a lewd and lascivious act upon a child, together with two prior convictions of a felony." The district court sentenced him to 50 years and it is from this conviction that the defendant appeals.

The facts giving rise to this appeal are as follows: On or about May 27, 1962, a ten year old girl and her two younger brothers were seated in their parent's car in front of a Great Falls bar. They had been left there by their parents who had entered the bar. The defendant was in this same bar and he admits being somewhat intoxicated. He left the bar and upon seeing the children in the car approached it and informed the children that his name was Adam Green and that he knew their daddy very well. He then said to them: "I will offer each of you one dollar if you will come sit in my car." The offer was refused by the girl and her brothers and so the defendant returned to his own car, which was parked nearby. A few minutes later he returned to the children's car. On this occasion he attempted to shake hands with the two boys who were in the back seat. In attempting to do this he scratched the hand of one of the boys. He then climbed into the front seat of the car and rested his arm on the back of it. The palm of his hand was behind the little girl's head. His arm remained in this position for a couple of seconds and it touched her hair and shoulders. The defendant again asked the ten year old girl to shake his hand, which was answered by a request to leave the car. He then got out of the car and returned to his own car. At this juncture the mother and father of the children emerged from the bar. The father went over to the defendant's car and upon hearing his wife exclaim that the de-

·fendant had been bothering the children, dragged him out of his car and struck him several times. Eight or nine days later the defendant was arrested and taken to the county jail. Upon leave of court being granted, an information was filed on July 3, 1962, charging the defendant with the crime for which he was convicted. On January 22, 1963, the cause came on regularly for trial.

The first witness called by the State was the complaining witness who told all about the incident of May 27. This testimony was approximately the same as the facts which were set out heretofore in the opinion. She was followed by her younger brother who confirmed her testimony.

The State then called Dr. James J. Bulger, a medical doctor who had done *some* graduate work in psychiatry. He testified that he had examined the defendant *in 1953* and that on the basis of this examination he had made a report. Over objections by the defendant's counsel, the doctor was allowed to read the final paragraph of this report. It read:

"The psychiatric impression is that we are dealing with a man who is very seriously disturbed in the growth of his personality. As far as having learned to control his sexual urges in a manner which is compatible with the customs of our society the man has failed almost entirely and it is felt that there is no prospect that he will, at his present age and intelligence level, be able to learn such control. From a legal standpoint of view the man can be considered sane and accountable for his actions. From a psychiatric point of view his ability *to control his actions is so limited and his sense of responsibility so dwarfed in its growth* that the man can only be considered a permanent menace to the whole society and the only solution would appear to be continual segregation from the rest of the society."

This was the extent of the doctor's testimony. No attempt was made to connect it up with the occurrence of May 27, nor was there any mention made of the purpose of said testimony.

The next witness was Dr. Hamilton C. Pierce, a psychiatrist from Great Falls. He testified that he had examined the defendant *in 1957* and that he had made a psychiatric evaluation of him at the time. Dr. Pierce was asked concerning his conclusions. He stated:

"A. I found no evidence of psychosis or the legal term of insanity, my opinion was he suffers from a characterlogical defect, the term of which was anti-social reaction, he had extreme difficulty in handling his impulses, particularly in the sexual area, there was a greater possibility than with the average population of his acting out his impulses in the sexual area."

Then in response to a question concerning rehabilitation he stated:

"A. This was part of my thought in seeing him, I was asked as to the possibilities of rehabilitation; from his past history, my impression, my evaluation, I felt it unlikely for him to be rehabilitated, his difficulty was so firmly entrenched and his motivation to change was not such as to help him be rehabilitated."

This was the gist of his testimony, again there was no attempt on the part of the state to connect this testimony with the occurrence of May 27. It seemed to be more concerned with his subsequent incarceration than with the crime that he allegedly committed.

The State then called Dr. George Gelernter, another Great Falls psychiatrist. He testified that he examined the defendant in July of 1962 at the request of the county attorney. The purpose of this examination, he stated, was for a general evaluation with particular emphasis on the possibilities of rehabilitation. He stated that he made a report and was allowed over objection by defense counsel to state the conclusions that he reached. He testified as follows:

"A. I felt that Mr. Green was a sexual deviate; that he had poor control of his impulses; that he was subject to periods of

heavy drinking and when drinking he was even under less control of his impulses; he was poorly motivated insofar as wanting help, he seemed to feel there should be some magic way to get free of this problem, he seemed to have very little idea as to what was involved to get help, and he had very little desire to get it; he had never sought help prior to this time.

"Q. Do you feel there is any chance for rehabilitation of this man based on your evaluation? A. I never like to say a man can't be rehabilitated; I felt the chance here was probably very small because of lack of motivation, his limited intelligence and the poor facilities available.

"Q. Did you arrive at a conclusion as to his relationship with society? A. In my opinion he represented a threat to society because of his inability to control his impulses."

The essence of this doctor's testimony, it can be seen, went to the possibility of the defendant's ability to be rehabilitated. Here again, there was no attempt on the part of the State to connect his "problem" with the events of May 27. The only thing that was discussed was his apparent mental illness.

The State next called the father of the little girl who testified concerning the events of May 27. He stated that he had met the defendant before, but that he was not intimately acquainted with him. He described the altercation that took place at the defendant's car.

The State concluded its case in chief with the mother of the children who testified that her children told her that the defendant had been in their car and that she related this information to her husband. She also described the altercation which occurred.

The defendant took the stand in his own behalf and gave his version of what happened on the day in question. He stated that he knew the children and that he was merely attempting to shake their hands. On cross examination the defendant was questioned about a personal problem with small children. To which he replied that he had one to an extent. He stated

however, that on the day in question he was not bothered by this so called "problem." The State on cross examination attempted to question the defendant concerning incidents similar to the one in question, where he was picked up.

"Q. Did you tell them anything about any instance from the time you were released the last time? A. No.

"Q. Do you recall telling them anything about the Civic Center? A. That was the same thing."

The State offered in rebuttal, William Burton, deputy county attorney. Mr. Burton's testimony was concerned with the interrogation of the defendant subsequent to his arrest. A portion of the testimony will be set out herein to show the line of questioning indulged in by the prosecution.

"Q. With relation to this interrogation tell the Court and jury what Mr. Green told you at that time if you are able to recall? A. * * * I then asked him if he had this trouble in the past, he said he did have trouble, replied in the affirmative; I asked him if he could remember any incidents prior to the Green Lantern and since he got out of the penitentiary. [Objected to as irrelevant and objection sustained.]

"Q. Did Mr. Green in your interrogation relate to you any incident after the time he was released from the penitentiary and up to the time you interrogated him relative to any incidents involving children? A. He did.

"Q. Where did he say these took place? [Objection sustained.]

"Q. Did he tell you where the incidents took place? [Objection sustained.]

"Q. Did he tell you at any time of any incidents relative to the Civic Center? [Objection sustained.]"

The bulk of the testimony offered in rebuttal did not concern itself with what happened at the interrogation in the county jail, but rather was an attempt on the part of the State to bring out the fact that this defendant had allegedly been picked up on different occasions for molesting children.

Sex offenses, especially those arising under section 94-4106, relating to lewd and lascivious acts upon children are viewed with abhorrence by the public. That is why we think that the language of this court in State v. Keckonen, 107 Mont. 253, 266, 84 P.2d 341, 346, is particularly apropos:

"* * * Crimes against nature are naturally revolting to a normal person, and the subject is truly a loathsome one. In such cases, jurors are sometimes moved by abhorrence of the offense to convict upon slight evidence. * * * this fact alone should be enough to put a tribunal assiduously on guard against yielding to the dictates of such intense prejudice."

It is with this caution in mind that we have reviewed the proceedings in this appeal before us.

Article III, § 27, of the Constitution of Montana, guarantees that "No person shall be deprived of life, liberty, or property without due process of law." The Federal Constitution contains the same guarantee in Amendment V. This court in the case of State v. Dryman, 127 Mont. 579, 269 P.2d 796, held that our section 27 guarantees the defendant the right to a fair trial. This is a fundamental right and should be zealously guarded without regard to the guilt or innocence of the accused. The duty of seeing that this right is protected and preserved inviolate falls upon the shoulders of the judiciary. In the first instance it is the duty of the trial court to preserve this right, however should they fail, then it is the duty of this court to see that it is preserved.

The record indicates that in its opening statement the prosecution stated that it would through medical testimony of three expert witnesses prove the defendant's state of mind at the time he committed the act. Clearly this was not done. The testimony of these doctors transformed what had theretofore been a criminal prosecution into a commitment proceeding. This is apparent from the nature of the testimony elicited by the prosecution. Dr. Bulger stated:

"* * * the man can only be considered a permanent menace

to the whole society and the only solution would be continual segregation from the rest of society." Dr. Pierce said: "I felt it unlikely for him to be rehabilitated, his difficulty was so firmly entrenched and his motivation to change was not such as to help him be rehabilitated." Dr. Gelernter testified: "In my opinion he represented a threat to society because of his inability to control his impulses." As has been previously pointed out in this opinion, no effort was made by the prosecution to use the testimony of these doctors to prove intent. This fact is further bolstered by the testimony itself. The doctors spoke continually of the defendant's so-called problem, however it was always described in general terms, such as, "sex deviate," "anti-social reaction," and "Acting out his impulses in the sexual area." Never once in their testimony do they describe exactly what the defendant's problem is or how it is apt to be manifested. It is impossible to tell, from a reading of their testimony, whether or not this problem of the defendant even related to little children. This is so, primarily because of the failure of the prosecution to link their testimony to the facts of the case.

After hearing such testimony from the doctors, what jury would not feel that this man should be locked up? The opinion of these doctors could not have but helped overwhelm the jury into convicting this defendant, not because of what he had done, but because of what they thought he might do. In the final analysis, it appears that the defendant was convicted for being a sexual deviate. Whether he actually is or not, is immaterial because he could not be criminally charged with such an offense in Montana. Unlike many states, Montana does not have a "sexual psychopath" law, which provides for a determination, during a pending criminal action and after a thorough medical and psychiatric examination, of whether the individual involved is a "sexual psychopath or deviate" and further providing for civil commitment and treatment. The need for such legislation is a matter for the Legislature. See

242

Annotation 24 A.L.R.2d 350. However should a person pose a threat to society, in Montana, the public can protect itself by virtue of the provisions of Chapter 2 of Title 38, R.C.M.1947, which provides for civil commitment of the mentally deranged.

For the foregoing reason, the judgment is reversed and the case remanded for a new trial or such other proceedings as the state deems necessary.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES CASTLES, ADAIR and DOYLE concur.